1

2                   **UNITED STATES DISTRICT COURT**

3                         **DISTRICT OF OREGON**

4                        **PORTLAND DIVISION**

5    AUDUBON SOCIETY OF PORTLAND        )
     and WILLAMETTE RIVERKEEPER,        )
6                                       )
                    Plaintiffs,         )      **No. 03:11-cv-00494-HU**
7                                       )
     vs.                                )
8                                       )      **ORDER ON PLAINTIFFS' MOTION**
     NATIONAL MARINE FISHERIES          )      **FOR PRELIMINARY INJUNCTION**
9    SERVICE and U.S. ARMY CORPS        )
     OF ENGINEERS,                      )
10                                      )
                    Defendants.         )
11                                      )
     PORT OF PORTLAND,                  )
12                                      )
                    Intervenor.         )
13                     _____

14

15   Daniel J. Rohlf
     Lewis & Clark Law School
16   10015 S.W. Terwilliger Boulevard
     Portland, OR 97219
17
          Attorney for Plaintiffs
18

19   Kevin William McArdle
     U.S. Department of Justice
20   Environment & Natural Resources Division
     Wildlife & Marine Resources Section
21   P.O. Box 7369
     Washington, DC  20044-7369
22
          Attorney for Defendants
23

24   Beverly C. Pearman
     Peter D. Sax
25   Stoel Rives LLP
     900 S.W. Fifth Avenue
26   Suite 2600
     Portland, OR 97204
27
          Attorneys for Intervenor
28

1 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

HUBEL, Magistrate Judge:

This matter is before the court on the plaintiffs' Motion for Preliminary Injunction and supporting documents, Dkt. ##5-8. The defendants have filed a response in opposition to the motion, Dkt. ##19-22; the Intervenor has filed an opposition to the motion, Dkt. ##14-18; and the plaintiffs have filed a reply, Dkt. ##23, 24 & 28. The court heard oral argument on the motion on July 25, 2011, and took the motion under advisement at that time. Having considered all of the parties' briefs and declarations, and the arguments of counsel, I **deny** the motion.

## I.   INTRODUCTION

On April 22, 2011, the plaintiffs Audubon Society of Portland and Willamette Riverkeeper filed a Complaint for Declaratory and Injunctive Relief against the defendants National Marine Fisheries Service ("NMFS")[1] and U.S. Army Corps of Engineers ("the Corps"). Dkt. #1.  The impetus for the filing of the Complaint is dredging activity scheduled to take place between river miles 2.1 and 2.4 on the Lower Willamette River between July 1 and October 31, 2011 (the

/ / /

/ / /

/ / /

---

[1]Although the parties refer to this defendant as the "National Marine Fisheries Service (NMFS)," the agency, which is part of the National Oceanic and Atmospheric Administration, is properly called the "NOAA Fisheries Service."  *See* http://www.nmfs.noaa.gov/; *see also Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, Nos. CV 01-640-RE, CV 05-23-RE, 2005 WL 1278878, at *1 n.1.
Nevertheless, because the parties refer to the agency as "NMFS," the court will use that designation in this opinion to avoid confusion.

2 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1    "in-water work window" for that portion of the river).[2]   The
2    dredging action proposed by the Corps would remove some 75,000
3    cubic yards of sediment that has built up in the "Post Office Bar"
4    area on the east side of the Willamette River, to return the
5    channel in this location to its intended depth and width.   The
6    removed sediment would be transported by barge for disposal on West
7    Hayden Island.   According to the plaintiffs, the dredges "would
8    work up to 7 days a week and 24 hours a day during one month of the
9    in-water work window." Dkt. #1, ¶ 33.

10       On May 13, 2010, NMFS issued a biological opinion (the "BiOp")
11   on the proposed dredging. *See* Dkt. #8, Jolliffe Decl., Ex. 2.   In
12   the BiOp, NMFS concluded the proposed dredging action was not
13   likely to jeopardize the continued existence of several species of
14   salmon and steelhead currently listed as threatened species, or to
15   damage their critical habitat.   These species of fish,
16   characterized by the plaintiffs as "evolutionarily significant
17   units (ESUs)," include Upper Willamette River Chinook salmon
18   (*Oncorhynchus tshawytscha*), Lower Columbia River Chinook salmon,
19   Lower Columbia River steelhead (*O. mykiss*), Upper Willamette River
20   steelhead, and Lower Columbia River coho salmon (*O. Kisutch*)
21   (collectively, the "Pacific salmonids" or the "listed species").
22   *Id.*, cover letter; Dkt. #1, ¶ 2.

23       In the plaintiffs' Complaint, they allege the Corps has a duty
24   to comply with the Endangered Species Act, 16 U.S.C. § 1531, *et*
25   *seq.* ("ESA"), prior to authorizing any dredging activity that may

26

27       [2]"[T]he Corps has agreed not to commence any in-water work
28   prior to the issuance of the Court's ruling on Plaintiffs' motion
     or August 1, 2011, whichever occurs first." Dkt. #4, p. 2.

3 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1  affect "listed species or designated critical habitat."  Dkt. #1,
2  ¶ 11.   The plaintiffs allege the Corps violated the ESA and the
3  Administrative Procedures Act, 5 U.S.C. § 701, *et seq.* ("APA"), "by
4  failing to ensure that its approval of Post Office Bar dredging is
5  not likely to jeopardize the continued existence of listed species
6  or  destroy  or  adversely  modify  designated  critical  habitat."
7  Dkt. #1, ¶ 3.

8       The plaintiffs further allege that NMFS is "responsible for
9  the lawful administration of the ESA with respect to anadromous
10 fish, including those at issue in this case."  Dkt. #1, ¶ 10.  The
11 plaintiffs claim the BiOp issued by NMFS is "illegal," and NMFS has
12 violated the ESA and APA by issuing the illegal BiOp.  *Id.*

13      For  these  alleged  violations,  the  plaintiffs  seek  the
14 following relief:

15           [T]hat the Court declare the Corps has failed
            to ensure that its approval of the Post Office
16          Bar  dredge  project  BiOp  avoids  jeopardy  to
            listed ESUs and avoids destruction or adverse
17          modification  of  designated  critical  habitat;
            hold unlawful and set aside NMFS'[s] BiOp for
18          this  project  and  order  NMFS  to  rescind  the
            BiOp;  order  the  Army  Corps  to  reinitiate
19          formal consultation with NMFS under Section 7
            of the ESA; require NMFS to issue a valid BiOp
20          for  the  Post  Office  Bar  dredge  project;  and
            enjoin  any  dredging  activity  at  Post  Office
21          Bar pending the Corps' and NMFS'[s] full com-
            pliance with the ESA.
22
23 Dkt. #1, ¶ 4.

24      The plaintiffs have filed a motion for preliminary injunction
25 to prevent the dredging action from going forward, and to prevent
26 NMFS  from  authorizing  any  incidental  taking  of  the  Pacific
27 salmonids,  until  the  court  has  ruled  on  the  merits  of  the
28 plaintiffs' Complaint.  Dkt. #5.

4 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1

## II.   STATUTORY AND REGULATORY FRAMEWORK

2 The ESA was enacted in 1973 to conserve endangered species and
3 the ecosystems upon which they depend. 16 U.S.C. § 1531(b) (noting
4 "the United States has pledged itself as a sovereign state in
5 the international community to conserve to the extent practicable
6 the various species of fish or wildlife and plants facing
7 extinction"). The ESA requires "all Federal departments and
8 agencies" to use "*all methods and procedures which are necessary to*
9 *bring any endangered species or threatened species* to the point at
10 which the measures provided pursuant to [the ESA] are no longer
11 necessary." 16 U.S.C. § 1531(c); *Tennessee Valley Authority v.*
12 *Hill*, 437 U.S. 153, 180, 98 S. Ct. 2279, 2295, 57 L. Ed. 2d 117
13 (1978) (emphasis in original). The Supreme Court observed that
14 Congress's "plain intent" in enacting the ESA "was to halt and
15 reverse the trend towards species extinction, whatever the cost.
16 This is reflected . . . in literally every section of the statute."
17 *Id.*, 437 U.S. at 184, 98 S. Ct. at 2297. The Supreme Court has
18 observed that the mandates of the ESA are to be afforded the
19 highest priority by federal agencies. *Id.*, 437 U.S. at 185, 98 S.
20 Ct. at 2297 ("[T]he legislative history undergirding § 7 reveals an
21 explicit congressional decision to require agencies to afford first
22 priority to the declared national policy of saving endangered
23 species.").

24 Pursuant to section 7 of the ESA, in any non-exempt action
25 where there is discretionary federal involvement or control, the
26 involved federal agencies are required to consult with "the Secre-
27 / / /

28 / / /

5 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

tary"[3] to ensure that the agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species. . . us[ing] the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.03. The term "[j]eopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. In using the "best scientific and commercial data available," the agency is prohibited "from disregarding available scientific evidence that is in some way better than the evidence [it] relies on," and it "cannot ignore available biological information." *Kern County Farm Bur. v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006) (internal quotation marks, citations omitted).

Judge James A. Redden of this court explained the requirements of this agency "consultation" in *National Wildlife Federation v. NMFS*, Nos. 01-cv-640, 05-cv-23, 2005 WL 1278878 (D. Or. May 26, 2005), *aff'd* 524 F.3d 917 (9th Cir. 2008) ("*NWF I*"):

/ / /

---

[3]Under the ESA, the term "Secretary" may refer to the Secretary of the Interior, the Secretary of Commerce, or sometimes the Secretary of Agriculture, depending on which program or proposed action is involved. 16 U.S.C. § 1532(15). NOAA and NMFS are subagencies of the United States Department of Commerce, and the Secretary of Commerce is responsible for overseeing their administration of the ESA with regard to the anadromous salmonids at issue in this case. *See id.*; note 1, *supra*; 50 C.F.R. § 402.01(b).

During a section 7 consultation, the consulting agency must "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(3). The agency must "[f]ormulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.*

"Cumulative effects" are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02. "Effects of the action" are "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." [*Id.*]

The environmental baseline "includes all past and present impacts [on listed species and their critical habitat] of all Federal, State, private, and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." [*Id.*]

*NWF I*, 2005 WL 1278878, at *6.

Judge Redden further explained that if the biological opinion, or "BiOp," required by section 7 concludes that a proposed agency action "will jeopardize a listed species, the opinion must include the reasonable and prudent alternatives to the agency's action plans." *NWF I*, 2005 WL 1278878, at *5.

A biological opinion "should address both the jeopardy and critical habitat prongs of Section 7 [of the ESA], by considering the current status of the species, the environmental baseline, the effects of the proposed action, and the cumulative effects of the

7 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1                     proposed action." *Gifford Pinchot Task Force*

2                     *v. U.S. Fish & Wildlife Service*, 378 F.3d
                   1059, 1063 (9th Cir. 2004) (citing 50 C.F.R.

3                     § 402.14(g)(2)-(3)).

4  *NWF I*, 2005 WL 1278878, at *6. "Reasonable and prudent

5  alternatives refer to alternative actions identified during formal

6  consultation . . . that [are] economically and technologically

7  feasible, and that the [consulting agency] believes would avoid the

8  likelihood of jeopardizing the continued existence of listed

9  species or resulting in the destruction or adverse modification of

10  critical habitat." 50 C.F.R. § 402.2.

11      The "jeopardy analysis" the BiOp is required to address

12  "include[s] viewing the proposed action against 'the aggregate

13  effects of everything that has led to the species' current status,

14  and, for non-Federal activities, those things likely to affect the

15  species in the future.'" *Id.* (quoting *Endangered Species*

16  *Consultation Handbook - Procedures for Conducting Consultation and*

17  *Conference Activities Under Section 7 of the Endangered Species*

18  *Act*, at 4-35 (1998) (the "Consultation Handbook"). The

19  Consultation Handbook notes that with certain exceptions not

20  relevant here,

21                     "[A] jeopardy opinion is rendered when the
                   total of the species' status, environmental

22                     baseline, effects of the proposed action, and
                   cumulative effects lead to the conclusion that

23                     the proposed action is likely to jeopardize
                   the continued existence of the entire species,

24                     subspecies, or vertebrate population as
                   listed."

25

26  *Id.* (quoting the Consultation Handbook at 4-36). In other words,

27  a jeopardy opinion is warranted when agency actions are likely to

28  jeopardize an entire listed species or an entire critical habitat.

8 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

Section 9 of the ESA makes it unlawful to "take" any endangered species of fish or wildlife except under certain circumstances. 16 U.S.C. § 1538(a)(1)(B). To "take" a species means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). A "taking" may be permitted if it "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity," but only after the applicant for such a permit submits a conservation plan that is approved by the Secretary. 16 U.S.C. § 1539(a)(2)(A).

When a proposed taking is by a federal agency, the Secretary may allow an "incidental taking" if, after consultation with the federal agency, the Secretary concludes that the proposed agency action either will not jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of the habitat of such species (collectively, the "adverse impact"), or that the agency action "offers reasonable and prudent alternatives which the Secretary believes would not [cause the adverse impact]; and that "the taking of an endangered species or a threatened species incidental to the agency action will not [result in the adverse impact]." 16 U.S.C. § 1536(a)(2) & (b)(4). An Incidental Take Statement ("ITS") issued by the Secretary is a written statement that:

 (i) specifies the impact of such incidental taking on the species,

 (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

 (iii) in the case of marine mammals, specifies those measure that are necessary to comply with

1             section 1371(a)(5) of [title 16 USC] with
             regard to such taking, and

2

3 (iv)   sets forth the terms and conditions (includ-
       ing, but not limited to, reporting require-

4        ments) that must be complied with by the
       Federal agency or applicant (if any), or both,

5        to implement the measures specified under
       clauses (ii) and (iii).

6 16 U.S.C. § 1536(b)(4). The ITS "functions as a safe harbor

7 provision immunizing persons from [ESA] liability and penalties for

8 takings committed during activities that are otherwise lawful and

9 in compliance with its terms and conditions." *Arizona Cattle*

10 *Growers' Ass'n v. U.S. Fish & Wildlife, B.L.M.*, 273 F.3d 1229, 1239

11 (9th Cir. 2001) (citing 16 U.S.C. § 1536(o)).

12     The Ninth Circuit has noted that generally, an ITS establishes

13 "a 'trigger' that, when reached, results in an unacceptable level

14 of incidental take, invalidating the safe harbor provision, and

15 requiring the parties to re-initiate consultation. Ideally, this

16 'trigger' should be a specific number." *Arizona Cattle Growers'*

17 *Ass'n*, 273 F.3d at 1249 (citing cases where the ITS specified a

18 specific number; *e.g.*, *Fund for Animals, Inc. v. Rice*, 85 F.3d 535

19 (11th Cir. 1996) "(municipal landfill may take fifty-two snakes

20 during construction and an additional two snakes per year

21 thereafter)"). However, the court further noted that although

22 "Congress indicated its preference for a numerical value, it

23 anticipated situations in which impact could not be contemplated in

24 terms of a precise number." *Id.*, 273 F.3d at 1250 (citations

25 omitted). A numerical limit is not an absolute requirement, and

26 the court has upheld ITSs "that used a combination of numbers and

27 estimates." *Id.*, 273 F.3d at 1249 (citing cases). Ecological

28 conditions may be used "as a surrogate for defining the amount or

1  extent of incidental take . . . so long as these conditions are
2  linked to the take of the protected species." *Id.*, 273 F.3d at
3  1250 (internal quotation marks omitted).  The court found this use
4  of a "surrogate" to be consistent with the provisions of the
5  Consultation Handbook:

6         "When preparing an incidental take statement,
       a specific number (for some species, expressed
7       as an amount or extent, e.g., all turtle nests
       not found and moved by the approved relocation
8       technique) or level of disturbance to habitat
       must be described.  Take can be expressed also
9       as a change in habitat characteristics
       affecting the species (e.g., for an aquatic
10      species, changes in water temperature or
       chemistry, flows, or sediment loads) where
11      data or information exists which links such
       changes to the take of the listed species.  In
12      some situations, the species itself or the
       effect on the species may be difficult to
13      detect.  However, some detectable measure of
       effect should be provided. . . .  [I]f a
14      sufficient causal link is demonstrated (i.e.,
       the number of burrows affected or a quanti-
15      tative loss of cover, food, water quality, or
       symbionts), then this can establish a measure
16      of the impact on the species or its habitat
       and provide the yardstick for reinitiation."
17

18 *Id.* (quoting the Consultation Handbook at 4-47 to 4-48).  The court
19 explained that "[b]y 'causal link' we do not mean that the [agency]
20 must demonstrate a specific number of takings; only that it must
21 establish a link between the activity and the taking of species
22 before setting forth specific conditions." *Id.*

23      This statutory and regulatory framework provides the
24 foundation upon which the parties base their arguments.
25 / / /
26 / / /
27 / / /
28 / / /

### III.   HISTORICAL BACKGROUND

As background for the reason the ESUs in this case are facing extinction, the plaintiffs set forth the following history which has not been challenged by the defendants:

> The Willamette River and the habitat it provides for threatened salmon and steelhead are fundamentally degraded and altered from historic conditions. Since the 1970s, development began to strip away the riparian forests surrounding the river, resulting in large functional losses to the river's complexity and productivity and reducing the amount of habitat crucial for salmon and steelhead. Once highly braided and complex, the Willamette River system was also dramatically simplified through activities such as channelization and the placement of bank stabilizing "revetments."[4]   The river banks are now lined with more than 96 miles of revetments, about half of which the Corps constructed. These activities and the resulting impacts reduced available salmonid rearing habitat by as much as 75%. Moreover, thirty-seven dams in the basin now block salmonid access to more than 435 miles of important stream and river spawning habitat in the Willamette Basin, and altering temperature regimes in the Willamette River and its tributaries. Finally, while human civilization has advanced in the region, water quality, salmon and steelhead and their habitat have suffered further due to agriculture, urbanization, mining, and timber harvest; adverse impacts from the river dredging and associated industrial activities resulted in additional additive harm.

/ / /

/ / /

/ / /

/ / /

---

[4] "Revetments" are "[f]ortified riverbanks intended to keep the river from meandering."  Dkt. #8, Jolliffe Decl., Ex. 4, Executive Summary of 2008 Willamette Project Biological Opinion, at p. 4 n.1.

12 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

Dkt. #6, pp. 6-7; *see* Dkt. #8, Jolliffe Decl.[5], Ex. 5, a Corps summary of NMFS's July 11, 2008, BiOp, entitled "Supporting fish recovery in the Willamette Valley" (May 2010).

The plaintiffs note that NMFS issued a BiOp on February 23, 2004, that examined "all basins in Oregon with anadromous fish use . . . or designated critical habitat." Dkt. #6, p. 7 (citing the Feb. 23, 2004, BiOp (the "2004 BiOp") at 6, Dkt. #28, Ex. 1, p. 6). The plaintiffs point to the following findings NMFS made in the 2004 BiOp:

> [N]ot all of the biological requirements of the listed and proposed species for freshwater habitat in general, water quality in particular, are being met under the environmental baseline in many streams and watersheds occupied by listed salmon and steelhead in Oregon. Their status is such that there must be a significant improvement[] in the environmental conditions they experience, over those currently available under the environmental baseline, to meet the biological requirements for survival and recovery of these species.

---

[5]Michael Jolliffe is a recent graduate of Lewis & Clark Law School, where he "worked with the Pacific Environmental Advocacy Center, the law school's environmental law clinic," where the majority of his work was "on cases related to protection and conservation of salmon and steelhead in the Columbia River Basin[.]" *Id.*, ¶ 2.

In the present case, Jolliffe was asked to assess the extent to which NMFS, in its consideration of whether a proposed agency action on the Willamette and lower Columbia Rivers will adversely impact the ESUs and their critical habitat, "considers impacts on the listed species and designated critical habitat stemming from previous federal agency actions affecting these same ESUs and critical habitat." *Id.*, ¶ 5. In making his assessment, Jolliffe compiled a list of relevant NMFS BiOps issued since January 1, 2005, and he considered each of them in detail, summarizing his findings in his Declaration, Dkt. #8.

The defendants do not challenge Jolliffe's representations regarding the previous BiOps. To the extent Jolliffe merely sets forth the results of his research, and does not attempt to offer expert opinion regarding scientific matters, the court accepts his factual representations as true for purposes of the plaintiffs' motion for preliminary injunction.

1
2
3

> Any further degradation of these conditions
> would significantly reduce the likelihood of
> survival and recovery of these species due to
> status of the environmental baseline.

4  Dkt. #28, Ex. 1, p. 24. Notably, however, the project considered
5  in the 2004 BiOp was for a much larger and more diverse area than
6  the Post Office Bar dredging project, and it concluded there would
7  be improvements to the entire project area over a period of years.

8        The plaintiffs conducted a comprehensive search and compiled
9  a listing of all BiOps issued by NMFS "that consider projects
10 likely to adversely affect ESUs in the Willamette Basin and lower
11 Columbia River" between January 1, 2005, and the May 13, 2010, BiOp
12 at issue in this case. Dkt. #8, Decl. of Michael Jolliffe, ¶ 5 &
13 Ex. 3. The listing compiled by the plaintiffs includes 151 NMFS
14 BiOps in which NMFS "assessed adverse impacts on upper Willamette
15 chinook and steelhead . . . [and in some instances] also assessed
16 impacts on threatened lower Columbia steelhead, chinook and coho."
17 *Id.*, ¶ 7 & Ex. 3. According to Mr. Jolliffe, the adverse impacts
18 found by NMFS in these BiOps "included further losses of riparian
19 vegetation and increases in turbidity; increased release of
20 chemical contaminates, adverse effects on the food base, and
21 increased predation rates; restrictions of fish passage; and
22 adverse effects on juvenile salmonids in the project area." *Id.*

23      The plaintiffs assert that of these 151 BiOps, there was only
24 one, a July 11, 2008, BiOp (the "2008 Jeopardy BiOp"), in which
25 NMFS made a finding of jeopardy. *Id.*; *see id.*, Ex. 4, "Executive
26 Summary [of the] 2008 Willamette Project Biological Opinion,"
27 issued by NMFS on July 11, 2008. The BiOp specified that "the
28 action area for purposes of the consultation includes the entire

14 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1  Willamette River downstream from the Corps' 13 Willamette Project
2  dams, as well as 20 miles of the Clackamas and Molalla Rivers
3  above their confluence with the Willamette."  Dkt. #8, Jolliffe
4  Decl., ¶ 7 & Ex. 6.

5       In an introduction to its Executive Summary of the 2008
6  Jeopardy BiOp, NMFS described its findings and the action taken as
7  a result of those findings as follows:

          The National Marine Fisheries Services
     (NMFS) completed a consultation with the U.S.
     Army Corps of Engineers, Bonneville Power
     Administration, and the Bureau of Reclamation
     (Action Agencies) on July 11, 2008, on the
     impact of the Willamette River Basin Project
     on species listed for protection under the
     Endangered Species Act.  NMFS found that the
     Action Agencies' Proposed Action alone was not
     sufficient to avoid jeopardy or adverse modi-
     fication of critical habitat for two species:
     Upper Willamette River chinook salmon and the
     Upper Willamette River steelhead, and would
     destroy or adversely modify their critical
     habitat.
          As a result, NMFS provided additional
     measures to mitigate for the projects'
     effects.  These measures include fish passage
     at three dams, temperature control downstream
     of another dam, changes in downstream flows,
     screening of irrigation diversions, improved
     hatchery practices and facilities and habitat
     improvement projects.  NMFS concluded that
     with the additional measures and timelines,
     combined with the Proposed Action, the
     Willamette Project could be operated and
     maintained without threatening the continued
     existence of the two Upper Willamette River
     salmonid species or destroying their critical
     habitat.  NMFS'[s] decision means that the
     species should survive, with an adequate
     potential for the species' recovery.
          This summary of NMFS'[s] Willamette River
     Project biological Opinion captures major
     elements of the Action Agencies' Proposed
     Action, NMFS analysis, and the resulting
     "reasonable and prudent alternative" actions.
     The Biological Opinion, issued by NMFS on
     July 11, 2008, contains detailed analyses
     undertaken in making its determination.

*Id.*, Ex. 4, p. 3.

According to the plaintiffs, the "reasonable and prudent alternative" ("RPA") specified by NMFS "will take many years and millions of dollars to fully implement."[6] Dkt. #6, p. 9 (citing Dkt. #8, Jolliffe Decl., ¶ 7. In addition, the 2008 Jeopardy BiOp established "a detailed organizational structure" to oversee implementation of the RPA, with the Corps and NMFS being "part of each element of this structure." *Id.*; *see* Dkt. #8, Jolliffe Decl., Ex. 7 (setting forth a diagram of the organizational structure).

Jolliffe's review of NMFS BiOps revealed thirty-three BiOps issued in connection with Willamette River projects between the 2008 Jeopardy BiOp and the Post Office Bar BiOp at issue in this case. Dkt. #8, Jolliffe Decl., ¶ 8. According to Jolliffe, none of those BiOps included any assessment or consideration of whether the RPA is being or has been implemented, and if so, to what extent, nor did NMFS consider "the additive impacts of previously authorized federal projects on listed ESUs and their critical habitat in assessing whether the proposal under consideration was likely to jeopardize listed ESUs or destroy or adversely modify designated critical habitat." *Id.*, ¶¶ 9 & 10; Dkt. #6, p. 9.

In his review of the thirty-three BiOps issued since July 11, 2008, Jolliffe found that NMFS had used very similar or even identical language to describe the status of affected ESUs. According to Jolliffe, NMFS repeatedly quoted from a 2007 study

_____

[6]The plaintiffs state the BiOp for the Corps' operation of the Willamette Project dam system was issued on May 11, 2008, rather than July 11, 2008. This appears to be an error, as the Executive Summary itself specifies the date of the BiOp as July 11, 2008. *See* Dkt. #8, Jolliffe Decl., ¶ 7 & Ex. 4, p. 3.

16 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1   that concluded "[n]umbers of spring chinook salmon in the
2   Willamette River basin are extremely depressed." *Id.*, ¶ 10
3   (citation omitted). Jolliffe states the language in the Post
4   Office Bar BiOp that discusses the status of Upper Willamette River
5   chinook salmon "is the same as it was in the 33 BiOps that preceded
6   it, with no mention of how the additive impacts of the federal
7   projects evaluated in those previous projects collectively affected
8   the status of [the] chinook and their critical habitat, for better
9   or worse." *Id.* The narrative language indicates the chinook
10  salmon have "a high risk of extinction, and . . . their critical
11  habitat [is] severely degraded." *Id.* However, the BiOp does not
12  "include any measurement of the additive impacts of projects for
13  which NMFS had previously issued biological opinions [or incidental
14  take statements] for federal projects that affected the same
15  species." *Id.*

16      Jolliffe further states that in none of the thirty-three BiOps
17  since 2008, has NMFS "made any effort to assess incidental take it
18  has previously authorized and either quantified numerically or
19  estimated using a surrogate, in assessing whether additional take
20  would jeopardize the continued existence of listed ESUs[.]" *Id.*,
21  ¶ 11. According to Jolliffe, the most recent quantitative data
22  cited in the thirty-three BiOps dealing with population numbers of
23  the ESUs at issue is from 2007; there is no scientific quantitative
24  data cited relating to population numbers of the ESUs since the
25  2008 Jeopardy BiOp was issued. *Id.*, ¶ 12.

26      Turning to the proposed action at issue here, the parties
27  agree that sediment has built up on the east side of the lower
28  Willamette River at the Post Office Bar. The Corps proposes to

17 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1  dredge the river to remove about 75,000 cubic yards of sediment.

2  In the defendants' brief, they describe the proposed dredging

3  action in some detail, relying primarily on the Declaration of

4  Sheryl Carrubba,[7] Dkt. #22.  According to Carrubba, the shoal at

5  the Post Office Bar has increased approximately ten inches in the

6  period from June 2010 to January 2011, and approximately five feet

7  since the Post Office Bar was last dredged in 1989.  *Id.*, ¶¶ 5 & 8

8  & Ex. 1, p. 5; Exs. 9 & 10.  Carrubba stated that "[i]n 2008, the

9  Corps determined that the lack of maintenance dredging at Post

10  Office Bar was presenting an increasing hazard to navigation and

11  was impacting access to Willamette River terminals and berths."

12  *Id.*, ¶ 5.  She cites the Corps' May 6, 2011, Final Environmental

13  Assessment ("EA") for the project as the best description of navi-

14  gation hazards and safety concerns represented by the increased

15  shoaling and lack of maintenance.  *Id.*  The EA is attached to

16  Carrubba's Declaration as Exhibit 2.  In the EA, the Corps stated

17  the following regarding the condition of the Post Office Bar, and

18  the need for maintenance dredging in the area:

19              The U.S. Army Corps of Engineers (Corps)
            is proposing to dredge a significantly shoaled
20          area called Post Office Bar, located between

21  _____

22  [7]Sheryl Carrubba has been employed by the Corps for about
    twenty-five years, currently serving, since 2004, as "Operations
23  Manager, Channels and Harbors Project, Operations Division,
    Portland District[.]" Dkt. #22, ¶ 1.  She has coordinated dredging
24  activities for the Corps, including budgeting, operations
    management of "hopper dredges and other floating plant (e.g.,
25  survey boats), and personnel for these activities." *Id.*, ¶ 2.
    Since 2008, her responsibilities have included oversight of
26  personnel involved in the proposed Post Office Bar dredging,
    management of the project, and environmental coordination for the
27  project. *Id.*  The court accepts Carrubba's factual representations
    as true for purposes of the plaintiff's motion for preliminary
28  injunction.

18 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

Willamette River mile (WRM) 2 and 3 in the lower Willamette River federal navigation channel (LWR FNC). The entire LWR FNC is almost 12 miles long and extends from the mouth of the Willamette River to the Broadway Bridge in Portland, Oregon [citation omitted]. The purpose of the proposed dredging project at Post Office Bar is to restore the 40-foot channel depth to allow for safe passage of deep-draft vessels that transport goods to and from some portions of Portland Harbor.

Channel maintenance at Post Office Bar is needed because a significant amount of shoaling has taken place since the channel in this location was last dredged in 1989. Post Office Bar poses a problem for outbound vessels because it occurs on an inside bend on the east bank of the river. The lack of maintenance dredging in this area presents a hazard to navigation and impacts access to LWR terminals and berths. Over 1,100 vessels transited past this shoal in 2008. Because of increasingly shallow depths, vessels are forced to transit at high tide only. With the high volume of traffic and timing constraints due to tidal influence, the potential for daily head-on encounters is greatly increased. The reduced channel width from shoaling in this area is especially dangerous because vessels moving around the bend in the river must orient the vessel at an angle. This maneuver requires more channel width than when the same vessels are transiting a straight stretch. Ships transiting this river bend also have to increase power to make the shoal-restricted turn. This increased speed creates a stronger likelihood that ships moored at the nearby T5 terminal could be pulled away from the dock. This can be damaging to the moored vessel, dangerous to work crews, and increase the risk of damage or loss of equipment and shipped goods as they are moved to or from the shore.

Large deep-draft vessels are now at the point of having to use the area as if it were a one-way channel or resort to a tug boat assisted transit. However, smaller vessels such as barges, tugs and recreational boats are still using the area and their presence narrows the usable path that the larger ships have available to maneuver the turn, and also increases the possibility of a potentially lethal collision or a high-energy ship grounding which could crack a ship's hull. The Columbia River Pilots have expressed grave

1
2
3
4
5
6
7
8

> concerns about this increasingly hazardous area and have specifically requested that the Corps dredge as soon as possible. Every year that the area goes without dredging the channel becomes narrower and shallower, increasing the danger of a high-energy ship grounding or collision. Such an accident could have devastating environmental, economic, and social impacts. The shoal continued to accumulate an additional 10 inches of sediment between Corps hydrographic surveys taken in June 2010 and January 2011. The most recent survey shows shoaling shallower than 34 feet in the 40-foot navigation channel.

9 *Id.*, Ex. 2, p. 1.

10      The defendants note that the area of the proposed dredging

11 lies within a designated Superfund site within Portland Harbor, and

12 "both the dredged and newly-exposed surface material will contain

13 concentrations of chemicals." Dkt. #19, p. 7 (citing Dkt. #22-11,

14 p. 2; Dkt. #22-2, p. 16). However, they further state that

15 "because Post Office Bar is a depositional area, new, cleaner

16 material is expected to cover the exposed surface relatively

17 quickly." *Id.* In addition, the Corps has "incorporated numerous

18 protective measures into the project to minimize the potential for

19 adverse environmental impacts, including impacts on threatened

20 salmon and steelhead." *Id.* (citing Dkt. #22-2, pp. 16-18; Dkt.

21 #22-12, pp. 5-10). Among other things, these protective measures

22 include the following: (1) the dredging project will occur during

23 the in-water work window, "when few salmonids are expected to be in

24 the project area"; *id.* (citing Dkt. #22-2, p. 16); (2) the dredging

25 activity "is limited to one month"; *id.* (citing Dkt. #22-11, p. 4;

26 Dkt. #22-12, p. 1); (3) "[a] close-lipped 'clamshell' dredge must

27 be used to minimize turbidity and reduce sediment drift during

28 dredging"; *id.* (citing Dkt. #22-11, p. 3); (4) dredging will occur

20 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

first in the areas with the highest chemical concentrations "to prevent contamination of cleaner areas and minimize downstream impacts"; *id.* (citing Dkt. #22-2, p. 17); (5) "[i]f listed salmonids are observed in distress or killed during dredging activities, dredging operations will immediately cease and NMFS will be notified"; *id.* (6) "[a]ll dredged material must be placed in watertight transport barges to avoid discharge during transport"; *id.* (citing Dkt. #22-11, p. 3); (7) "dredged material will be transported to an existing upland facility where it will be contained by dikes and managed to prevent it from moving outside the site boundary"; *id.;* and (8) "[p]lacement of material at the upland disposal site will not affect any aquatic species or habitat." *Id.; see* BiOp at 3-4.

The defendants note that when NMFS issued the May 13, 2010, BiOp, it defined an "action area" that not only included the 0.3-mile stretch encompassing the Post Office Bar (i.e., the area between River Miles ("RM") 2.1 and 2.4), it included the entire area from the Willamette River's confluence with the Columbia River to RM 2.9, "to encompass[] the full geographic extent of any direct or indirect effects of the project." Dkt. #19, p. 8 (citing the BiOp, p. 4). The defendants argue NMFS used "the best available science" to review the status of the affected salmonids and their habitat, evaluated the environmental baseline of the species in the action area, evaluated "the effects of the action and cumulative effects," and "concluded that the project is not likely to jeopardize the continued existence of any listed species or degrade critical habitat." *Id.* (citing the BiOp, pp. 6-21).

The defendants state that because NMFS found "only a small number of individual juvenile salmonids are likely to be harmed by the project," it included an ITS that estimates the amount or extent of incidental take. NMFS was unable to determine a specific number of fish likely to be taken, so it "used two surrogates to estimate take: dredging duration and anticipated turbidity levels." *Id.* (citing the BiOp, p. 22). "The ITS contains monitoring requirements to ensure that the surrogate take levels are not exceeded, and other terms and conditions to minimize the impact of any take." *Id.* (citing the BiOp, pp. 23-26). The Corps made an independent determination that no significant impact would occur to the listed salmon or steelhead "given the minimal geographic scope and duration of the project and the many protective measures." *Id.* (citing Dkt. #22-2, pp. 44-46, 53; Dkt. #22-11, pp. 4-5, 7).

## *IV.  THE MAY 13, 2010, BiOp*

In October 2008, the Corps submitted a letter and a biological assessment to NMFS regarding the proposed maintenance dredging action at the Post Office Bar. The Corps had concluded that the proposed action likely would have adverse effects on the Pacific salmonids at issue in this case, and also affect the species' critical habitat. BiOp at 1. Historically, the last dredging action in the area took place in 1997. Maintenance dredging was begun in 2000, but the action was suspended because Portland Harbor was designated as a Superfund site. Since 2000, significant shoaling has occurred at the Post Office Bar, and the Columbia River Pilots "have requested that the Corps dredge this area since

1  it poses a problem for outbound vessels because it occurs on an
2  inside bend in the river." BiOp at 2.

3      In proposing the action, the Corps listed eight measures they
4  would take to reduce adverse effects on the ESUs and their
5  habitats. *See* BiOp at 3-4, summarized *supra*. NMFS relied on the
6  Corps' description of these preventative measures and the Corps'
7  description of the proposed action in completing its consultation.
8  BiOp at 4. The "action area" identified by NMFS "is the Willamette
9  River, extending 0.5 miles upstream from the dredging (RM 2.9) and
10 downstream to the confluence with the Columbia River[,] . . . based
11 on the possible extent of turbidity and contaminant dispersion due
12 to dredging during a complete tidal cycle." *Id.*

13     In the BiOp, NMFS noted that to complete its jeopardy
14 analysis, it "reviewed the status of each listed species considered
15 in [the] consultation, the environmental baseline in the action
16 area, the effects of the action, and cumulative effects." BiOp at
17 5 (citation omitted). For its critical habitat adverse modifi-
18 cation analysis, "NMFS considered the status of the entire
19 designated area of the critical habitat considered in [the]
20 consultation, the environmental baseline in the action area, the
21 likely effects of the action on the function and conservation role
22 of the affected critical habitat, and cumulative effects." *Id.*
23 NMFS considered whether, if the proposed action went forward,
24 "critical habitat would remain functional, or retain the current
25 ability for the primary constituent elements (PCEs) to become
26 functionally established, to serve the intended conservation role
27 for the species[.]" *Id.* (citing a 2005 memorandum from William T.
28 Hogarth to Regional Administrators, Office of Protected Resources,

23 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

NMFS, Regarding Application of the "Destruction or Adverse Modification" Standard Under Section 79a)(2) of the ESA (Nov. 7, 2005)).

NMFS explained that it considers the current condition of the listed species "using criteria that describe a 'viable salmonid population' (VSP)." BiOp at 6.

> Attributes associated with a VSP include abundance, productivity, spatial structure, and genetic diversity that enhance [the species'] capacity to adapt to various environmental conditions and allow it to sustain itself in the natural environment. These attributes are influenced by survival, behavior, and experiences throughout the entire life cycle, characteristics that are influenced in turn by habitat and other environmental conditions.

*Id.* Using these criteria, NMFS identified a number of "major factors limiting the recovery" of the Lower Columbia River Chinook salmon, noting that a 2007 viability status report estimated the population was in the "extirpated or nearly so" persistence category. *Id.* NMFS indicate the LCR Chinook salmon population is "at high risk," and "[f]urther habitat changes in the Willamette River and in the Columbia River mainstem and estuary would likely have a significant effect on fall Chinook salmon." *Id.* (citing McElhany, P., M. Chilcote, J. Myers, R. Beamesderfer, "Viability Status of Oregon Salmon and Steelhead Populations in the Willamette and Lower Columbia Basin" (Sept. 2007), a report prepared for the Oregon Department of Fish and Wildlife, and the National Marine Fisheries Service, NOAA Northwest Fisheries Science Center, Seattle) ("McElhany 2007").

Regarding the Upper Willamette River spring-run Chinook salmon, NMFS found their numbers to be "extremely depressed." BiOp

24 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1  at 7 (citing McElhany 2007).  NMFS noted the species has "been
2  adversely affected by the degradation and loss of spawning and
3  rearing habitat (loss of 30 to 40%) associated with hydropower
4  development, and interaction with a large number of natural-
5  spawning hatchery fish."  *Id.*  Other major factors limiting the
6  recovery of this species also were noted.  *See id.*  NMFS noted the
7  McElhany 2007 study found the risk of extinction of this species to
8  be high.  *Id.*

9      With regard to the Lower Columbia River coho salmon, NMFS
10 noted that in general, the 25 populations that existed historically
11 in the Columbia River basin from the Hood River downstream "have
12 been in decline for the last 75 years."  *Id.*  Historically, the
13 numbers of wild coho returning "was at least 600,000 fish," while
14 "[a]s recently as 1996, the total return of wild fish may have been
15 as few as 400 fish."  *Id.*  However, in the past five years, the
16 numbers of wild coho in the Clackamas, Sandy, Scappoose, and
17 Clatskanie Rivers have increased moderately.  *Id.*  NMFS identified
18 several major factors limiting recovery of the LCR coho salmon, and
19 stated "the risk of extinction for coho in Oregon remains high."
20 BiOp at 7-8.

21     NMFS conducted a similar analysis with regard to the Upper
22 Willamette River and Lower Columbia River steelhead, concluding the
23 risk of extinction of both species is "moderate."  BiOp at 8-9.

24     In considering the critical habitat of all of the listed
25 species, NMFS found "the value of critical habitat for salmon and
26 steelhead is limited by poor water quality, altered hydrology, lack
27 of floodplain connectivity and shallow-water habitat, and lack of
28 complex habitat to provide forage and cover."  BiOp at 10.  NMFS

25 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

noted other factors likely to have "negative implications for the conservation value of designated critical habitats in the Pacific Northwest" including climate change, urban development, and industrial harbor and port development, all of which will affect the designated critical habitats to some degree.  BiOp at 9-11.

In determining the environmental baseline for the action area, NMFS noted the Post Office Bar site is within a designated Superfund site, "and is downstream from many sources of industrial contamination.  In addition, the river receives direct inputs of treated municipal wastes and industrial effluents that may contribute to the contamination of the river."  BiOp at 11. However, NMFS described vibra-core sampling of sediment at the Post Office Bar conducted on February 11, 2009, that indicated "material that would fill in the dredged channel is relatively clean and would accumulate relatively quickly."  *Id.*  NMFS noted that habitat conditions are "highly degraded" in the Lower Willamette River due to channelizing of streambanks, diking and filling of connected channels and wetlands, and other factors.  "Both juvenile and adult Chinook salmon, coho salmon, chum salmon, and steelhead use the dredging area as a migratory corridor and as rearing habitat for juveniles."  BiOp at 12; *see* BiOp at 11-13.

Regarding the effects of the proposed action, NMFS indicated the action "will affect the salmonid species considered in [the BiOp] by causing physical, chemical, and biological changes to the environmental baseline, and through direct effects . . . includ[ing] interaction with fish migrating through or rearing within the action area during dredging, effects to benthic and pelagic forage opportunities, and short-term negative water quality

26 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

effects (turbidity and increased exposure to contaminants)." BiOp at 14.  NMFS noted that both salmon and steelhead will be present in the area when the dredging occurs, and therefore their migration "may be delayed and fish will likely avoid the project vicinity." BiOp at 16.  If they are delayed in areas where cover and forage are unavailable, "then the delay will mean greater risk of predation, increased exposure to contaminants, and energetic costs associated with poor food availability and swimming in current." *Id.*  Juveniles will be affected more than adults, and juvenile salmonids will be more vulnerable than the adults to high concentrations of PCBs.  *Id.*

After considering the probable concentrations of contaminants and exposures to the listed species, NMFS concluded as follows:

> Since the proposed action will cause short-term (weeks) increases in contaminants in the water column and medium-term (months) increases in contaminants in the post-dredge surface until new, cleaner sediment accumulates, exposure to contaminants as a consequence of the proposed action is unlikely to result in lethality on a measurable scale, but may result in behavioral changes (*e.g.*, avoidance, altered feeding, delayed migration), physiological stress, and reduced fitness of juvenile ESA-listed salmonids that will likely lead to injury in some cases.

BiOp at 17-18.  NMFS further found that "[o]ver the long term (years), the proposed action will maintain existing water quality and habitat conditions at Post office Bar."  BiOp at 18.  In addition, "[e]ven among juveniles, only a small portion of the individuals are likely to be killed or injured by effects of the dredging.  Therefore, too few fish will be affected to produce a measureable [sic] effect on abundance, productivity, distribution,

or genetic diversity of any of the affected populations." BiOp at 18-19.

Regarding the effects on critical habitat, NMFS found the proposed action likely would "cause minor, localized and temporary (weeks to months) degradation of critical habitat PCEs for water and sediment quality, forage, and free passage. None of these adverse effects are likely to be significant at the scale of the river reach or watershed." BiOp at 19.

NMFS concluded that the proposed action would not likely jeopardize the continued existence of the ESUs, nor would it "result in the destruction or adverse modification of designated critical habitats for these salmonids." BiOp at 20. NMFS indicated the Willamette River likely will continue to be used as a major shipping lane "for decades," during which the "current degraded value of critical habitat" will continue unabated. "The negative effects of the action will be brief or an extension of the existing conditions, and will not contribute to a reduction in the conservation value of designated critical habitat for the ESA-listed species." BiOp at 20-21.

### V.   THE INCIDENTAL TAKE STATEMENT

In the ITS, NMFS first set forth the likely consequences of the dredging operation on the listed species:

> Activities necessary to complete the proposed maintenance dredging at Post Office Bar will take place within the active channel of the Willamette River when individuals of chinook salmon, coho salmon, and steelhead considered in [the BiOp] are likely to be present. Adverse effects of the proposed action will include the temporary loss of prey items for rearing juveniles, and an increase in turbi-

> dity, sediment, and pollutants such as DDT,
> PCBs, and metals.  The habitat that will be
> adversely affected by the proposed action is
> of moderate to poor quality and not limited at
> the site-specific or watershed scale. None-
> theless, these effects are reasonably likely
> to result in injuries and deaths of some
> juveniles of all species covered in [the BiOp]
> (except Columbia River chum salmon) within the
> action area.

BiOp at 22.  NMFS indicated it is unable to predict precisely the
numbers of "fish that are reasonably certain to be injured or
killed if their habitat is modified or degraded by the proposed
action." *Id.*  It opined that the "best available indicators for
the extent of take are duration of the proposed dredging and the
extent of suspended sediment plumes." *Id.*  If the thresholds for
either of those indicators are exceeded for extent of take, that
would trigger a re-initiation of consultation before further action
is taken. *Id.*

    NMFS listed two "reasonable and prudent measures" it found
"necessary and appropriate to minimize the impact of incidental
take of ESA-listed species from the proposed action," *id.*, to-wit:

> The Corps shall:
>
> 1.    Minimize incidental take from dredging by
>       applying conditions to the proposed
>       action that avoid or minimize adverse
>       effects to water quality and benthic
>       invertebrate organisms.
>
> 2.    Ensure completion of a monitoring and
>       reporting program to confirm this
>       incidental take statement is meeting its
>       objective of minimizing incidental take
>       from the proposed action.

BiOp at 23.

    In order to "implement reasonable and prudent measure #1,"
NMFS set out an extensive list of non-discretionary measures that

29 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

must be undertaken by the Corps. *See* BiOp at 23-26. These measures include, *inter alia*, limiting dredging to the "summer in-water work window (July 1 through October 31)"; collecting and analyzing benthic samples; confining "dredging impacts to the minimum area and duration necessary to complete the project"; beginning the dredging in the areas of highest contamination first; ensuring that "all digging passes of the bucket will be completed without any material intentionally being returned to the wetted area," and without dumping of dredged material back into the project area; not over-filling the bucket; closing the bucket slowly on the bottom, and pausing before hoisting the bucket to allow any overage to settle; monitoring turbidity; ceasing dredging operations if the weather conditions will not allow monitoring; keeping daily logs of turbidity monitoring; implementing a pollution control plan to prevent pollutants caused by the dredging from entering the river; monitoring the depth of new sediment accumulation and new surface sediment quality; and deploying "an absorptive boom during dredging to capture contaminants that may be floating on the water surface as a consequence of dredging." *Id.* In addition, should any future maintenance dredging take place, the Corps must ensure that "at least 1 foot of new sediment accumulated after this current dredging operation must be left in place so the dredged surface or sand cap is not re-exposed in the future." BiOp at 26.

To implement reasonable and prudent measure #2, the ITS directs the Corps to report all monitoring items to NMFS within specified time limits, and immediately report to NMFS "[a]ny exceedance of take covered by [the ITS]." *Id.* The Corps also must

30 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1  report immediately any sick, injured, or dead fish that are found

2  in the project area, and take remedial action "[i]f the proposed

3  action may worsen the fish's condition before NMFS can be

4  contacted," such as moving the fish to reduce its stress as much as

5  possible. *Id.*

6

7  ### VI.   *PRELIMINARY INJUNCTION STANDARDS*

8  Having now fully examined the nature of the proposed dredging

9  action, the historical background, and the BiOp and ITS at issue,

10  the court turns to consideration of the plaintiffs' motion for

11  preliminary injunction.   Ordinarily, to prevail on a motion for

12  preliminary injunction, a party must show (1) either a likelihood

13  of success on the merits of the case, or the existence of "serious

14  questions going to the merits," *Alliance for the Wild Rockies v.*

15  *Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011); (2) a likelihood

16  that the party will suffer irreparable harm in the absence of

17  preliminary relief, (3) that the balance of equities (or

18  "hardships") tips in the party's favor, *see id.*; and (4) that

19  issuance of a preliminary injunction is in the public interest.

20  *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009)

21  (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S.

22  7, ___, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008); *see*

23  *Cottrell*, 632 F.3d at 1134 (noting the "'serious questions' version

24  of the sliding scale test for preliminary injunctions remains

25  viable after the Supreme Court's decision in *Winter*).

26  However, the Ninth Circuit has articulated a standard for

27  preliminary injunctive relief in ESA cases "that arguably complete-

28  ly precludes the balancing of relative harms." *Pacific Coast Fed.*

31 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1  *of Fisherman's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1204 n.6

2  (E.D. Cal. 2008) (noting "[d]istrict courts in other circuits have,

3  in an abundance of caution, applied the traditional approach to

4  injunctive relief, while at the same time recognizing the balancing

5  of the equities and the determination of the public interest

6  already performed by Congress") (citations omitted).  Thus, in the

7  Ninth Circuit:

> The traditional preliminary injunction
> analysis does not apply to injunctions issued
> pursuant to the ESA. *Nat'l Wildlife Fed'n v.
> Burlington N. R.R., Inc.*, 23 F.3d 1508, 1510
> (9th Cir. 1994). "In cases involving the ESA,
> Congress removed from the courts their tradi-
> tional equitable discretion in injunction pro-
> ceedings of balancing the parties' competing
> interests." *Id.* at 1511 (citing *Friends of
> the Earth v. United States Navy*, 841 F.2d 927,
> 933 (9th Cir. 1988)). As the Supreme Court
> has noted, "Congress has spoken in the
> plainest of words, making it abundantly clear
> that the balance has been struck in favor of
> affording endangered species the highest of
> priorities." *TVA v. Hill*, 437 U.S. 153, 194,
> 98 S. Ct. 2279, 57 L. Ed. 2d 117 (1978).
> Accordingly, courts "may not use equity's
> scales to strike a different balance." *Sierra
> Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir.
> 1987); *see also Marbled Murrelet v. Babbitt*,
> 83 F.3d 1068, 1073 (9th Cir. 1996) ("Congress
> has determined that under the ESA the balance
> of hardships always tips sharply in favor of
> endangered or threatened species.").

21  *National Wildlife Fed. v. NMFS*, 422 F.3d 782, 793-94 (9th Cir.

22  2005) (quoted with approval in *Pacific Coast Fed.*, 606 F. Supp. 2d

23  at 1204, cataloguing cases in accord).  In light of this

24  determination, the *National Wildlife Federation* court rejected the

25  appellants' argument that the district court had erred as a matter

26  of law in failing to conduct a traditional preliminary injunction

27  analysis.  The court noted, "As the Supreme Court has instructed,

28  such an analysis does not apply to ESA cases because Congress has

32 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

already struck the balance."   *Id.*, 422 F.3d at 794 (citation omitted).

The court, therefore, must consider, first, whether the plaintiffs have met their burden to show either a likelihood of success on the merits, or alternatively, the existence of "substantial questions" regarding the merits.   Second, the court must consider whether the plaintiffs have shown a likelihood of irreparable harm if the injunction is not issued.

## VII.   LIKELIHOOD OF SUCCESS/SUBSTANTIAL QUESTIONS

In considering the plaintiffs' likelihood of success on the merits, the court first must examine the plaintiffs' claims in this case, and the defendants' and intervenor's responses.   In a nutshell, the plaintiffs do not seek to prevent the dredging action in the Post Office Bar completely; rather, they argue NMFS and the Corps have failed to comply with their statutory and regulatory obligations in connection with the proposed project, and they seek to halt the proposed action until the defendants have consulted as required and have considered the continuum of adverse impacts on the listed species over time.

### A.   The plaintiffs' arguments

The plaintiffs argue NMFS and the Corps failed to use "the best scientific and commercial data available," as required by section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and 50 C.F.R. § 402.14(d).  They note that the regulations require the defendants to evaluate both "the current status of the listed species or

33 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1  critical habitat," and "the effects of the action[8] and cumulative

2  effects on the listed species or critical habitat."  50 C.F.R.

3  § 402.14(g)(2) & (3).  They assert that the regulations "define the

4  latter to include a 'snapshot' of the species' and critical

5  habitat's health in light of all actions that have previously taken

6  place in the action area."  Dkt. #6, p. 16 (citation omitted)

7      The plaintiffs rely on *Defenders of Wildlife v. Babbitt*,[9] 130

8  F. Supp. 2d 121 (D.D.C. 2001), for the proposition that NMFS's

9  practice of viewing each federal action and incidental take in

10

11          [8]      Effects of the action refers to the direct and

12          indirect effects of an action on the species
            or critical habitat, together with the effects

13          of other activities that are interrelated or
            interdependent with that action, that will be

14          added to the environmental baseline.  **The
            environmental baseline includes the past and**

15          **present impacts of all Federal, State, or
            private actions and other human activities in**

16          **the action area,** the anticipated impacts of
            all proposed Federal projects in the action

17          area that have already undergone formal or
            early section 7 consultation, and the impact

18          of State or private actions which are contem-
            poraneous with the consultation in process.

19          Indirect effects are those that are caused by
            the proposed action and are later in time, but

20          still are reasonably certain to occur.  Inter-
            related actions are those that are part of a

21          larger action and depend on the larger action
            for their justification.    Interdependent

22          actions are those that have no independent
            utility apart from the action under considera-

23          tion.

24  50 C.F.R. § 402.02 (emphasis added).

25

26      [9]The plaintiffs mistakenly cite this case as *Fund for Animals
    v. Babbitt*.  *See* Dkt. #6, pp. 16-17.  The *Defenders of Wildlife*

27  court cites a case entitled *Fund for Animals v. Babbitt*, 903
    F. Supp. 96 (D.D.C. 1995), but it is the *Defenders of Wildlife* case

28  that is on point here.

34 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1   isolation from other impacts on the listed species is unlawful.

2   *Defenders of Wildlife* concerned BiOps prepared by the Fish and

3   Wildlife Service ("FWS") relating to the survival of Sonoran

4   pronghorn. The plaintiffs in *Defenders of Wildlife* argued, among

5   other things, that the BiOp and Biological Assessments prepared by

6   the defendants pursuant to EPA section 7's consultation

7   requirements were "deficient because they fail[ed] to analyze the

8   cumulative impacts or effects of other federal agency activities on

9   the survival of the Sonoran pronghorn[.]" *Id.*, 130 F. Supp. 2d at

10  122. The court first discussed the standard of review of the

11  agencies' actions, noting:

> In reviewing the action of the agencies, the Court must engage in a "thorough, probing, in-depth review," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971), to determine whether the agencies have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action. . . ." *Motor Vehicle Manufacturer's Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983). "In thoroughly reviewing the agency's actions, the Court considers whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fund for Animals v. Babbitt*, 904 F. Supp. 96, 105 (D.D.C. 1995) [citation omitted].

23  *Defenders of Wildlife*, 130 F. Supp. 2d at 124. The court then

24  examined the statutory framework, and determined that FWS had

25  failed to comply with section 7(a)(2) of the EPA, which requires

26  the agency to insure that its actions are "not likely to jeopardize

27  the continued existence of" the listed species at issue. *Id.*, 130

28  F. Supp. 2d at 125 (citing 16 U.S.C. § 1536(a)(2)).

35 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1    The court held that FWS was required to "analyze the effects
2    of the action in conjunction with the effects of other agencies'
3    actions on the pronghorn" something it had failed to do in its
4    BiOp. *Id.*, 130 F. Supp. 2d at 126. More specifically, the court
5    held "[t]he impact of an authorized incidental take cannot be
6    determined or analyzed in a vacuum, but must necessarily be
7    addressed in the context of other incidental take authorized by
8    FWS. . . . The [BiOp] must also include an analysis of the effects
9    of the action on the species when 'added to' the environmental
10   baseline - in other words, an analysis of the *total* impact on the
11   species." *Id.*, 130 F. Supp. 2d at 127-28 (quoting 50 C.F.R.
12   § 402.02 (emphasis in original). The court did not limit its
13   holding to the "action area" of the project in question, finding
14   that the agency could not define the action area narrowly "to
15   exclude federal activities that are impacting the pronghorn." *Id.*,
16   130 F. Supp. 2d at 126. The court effectively required FWS to
17   consider the cumulative impact on the pronghorn species-wide. *See*
18   *id.*

19   The plaintiffs argue that nearly all of the over 150 BiOps
20   issued by NMFS since 2005 "for projects with adverse impacts on
21   listed Willamette ESUs have included ITSs authorizing some level of
22   incidental take of these fish," yet NMFS has failed to keep track
23   of the cumulative incidental take over time. Dkt. #6, p. 17.
24   Nevertheless, NMFS continues to issue additional authorizations for
25   incidental take of "species which NMFS expressly acknowledges are
26   near extinction." Dkt. #6, pp. 17-18.

27   The plaintiffs argue the BiOp itself is "the best evidence"
28   that NMFS has failed to consider the impact of other federal

36 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

actions on the listed ESUs and critical habitat.  "For example, NMFS cites to a 2007 study finding that lower Columbia River chinook were at 'high risk' as of that date, and concluding that '[f]urther habitat changes in the Willamette River mainstem and estuary would have a significant effect on fall Chinook salmon.'" Dkt. #6, pp. 16-17 (citing BiOp at 6).  The plaintiffs assert that information is readily available to NMFS about take it has authorized previously "by simply examining its prior incidental take statements, yet NMFS did not consider this information prior to issuing the incidental take statement as part of the Post Office Bar BiOp." Dkt. #6, p. 18.  The plaintiffs claim NMFS continues to cite the same information repeatedly in its BiOps and ITSs regarding the current status of the ESUs and their habitat, despite the fact that NMFS "repeatedly authorizes additional adverse impacts and additional take[.]" *Id.*

The plaintiffs further argue NMFS failed to take into account its own 2008 Jeopardy BiOp, including consideration of whether the Corps is implementing the RPA and, if so, the effectiveness of those measures. Dkt. #6, pp. 19-20.  Again, the plaintiffs argue, this information should be "readily available to NMFS given that the agency is part of every work group and decision-making body for implementing the RPA." Dkt. #6, p. 20.

The plaintiffs conclude that NMFS has ready access to information that is relevant and vital to its jeopardy assessment in connection with the proposed dredging project.  The plaintiffs assert that information included in NMFS's prior BiOps and ITSs, "as well as monitoring data relevant to measures set forth in the Willamette Project RPA, constitutes the 'best science' regarding

37 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

the status of ESUs and their critical habitat affected by the Post Office Bar project." Dkt. #6, p. 21. The plaintiffs argue NMFS's failure to consider this available information in formulating the BiOp violated the agency's duty under section 7 of the ESA to use the "best available science." *Id.*

The plaintiffs further argue NMFS's conclusions regarding the likely effects of the proposed action are arbitrary and capricious. They assert that NMFS's failure to consider the impacts of past actions on the ESUs and critical habitat is like a person continually withdrawing money from a bank account without checking the balance first, resulting in the clear possibility that eventually, the account will be overdrawn. The plaintiffs argue NMFS's continuing to authorize adverse impacts and take without assessing whether the 2008 RPA has been effective is arbitrary and capricious. Dkt. #6, pp. 21-22.

The plaintiffs also argue NMFS has failed to consider the short-term adverse impacts to the listed ESUs. They rely on *Pacific Coast Federation of Fishermen's Association, Inc. v. NMFS*, 265 F.3d 1028 (9th Cir. 2001), where they state "the Ninth Circuit overturned a NMFS BiOp for failing to consider short-term adverse impacts to a salmon run despite acknowledging that 'even a low level of additional impact to any life form, especially the anadromous form which is at critically low levels, may reduce the likelihood of survival and recovery of the ESU as a whole.'" Dkt. #6, p. 22 (quoting *Pacific Coast*, 265 F.3d at 1037-38). The plaintiffs argue the same conditions are present in the present case as those the *Pacific Coast* court considered. They argue that although the 2008 Jeopardy BiOp set forth short-term measures

38 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

intended to prevent extinction of Lower Columbia Chinook, NMFS arbitrarily ignored "short-term impacts to this and other ESUs by reasoning that, despite short-term harms due to the proposed dredging, their habitat will not be any worse than normal over the long term."  Dkt. #6, pp. 22-23.

Contending NMFS failed to consider important aspects of the potential impacts of the Post Office Bar project, the plaintiffs argue the BiOp is arbitrary and capricious.  *Id.*, pp. 23-24 (quoting *Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000) ("A biological opinion is arbitrary and capricious and will be set aside when it has failed to articulate a satisfactory explanation for its conclusions or when it has entirely failed to consider an important aspect of the problem.").

The plaintiffs also argue the Corps failed to meet its "free-standing obligation to ensure that its actions are not likely to jeopardize affected ESUs or destroy or adversely modify their critical habitat."  Dkt. #6, p. 24 (citing *Resources Limited v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1993)).  The plaintiffs contend the information on past federal actions in the area is equally available to the Corps as it is to NMFS, and the Corps failed to consider the applicable information and arrived at an arbitrary conclusion.  *Id.*

The plaintiffs also argue the ITS is unlawful because the surrogates employed by NMFS are "'coextensive with the project's own scope' and both 'define[] and limit[] the level of take using the parameters of the project,'" a practice the plaintiffs state was deemed unlawful in *Oregon Natural Resources Council v. Allen*,

476 F.2d 1031, 1039 (9th Cir. 2007) ("*ONRC*").   Dkt. #6, p. 25

(quoting *ONCR v. Allen, supra*).   The plaintiffs argue

> NMFS'[s] use of surrogates for defining allow-
> able incidental take without linking those
> surrogates in a meaningful way to actual take
> is much like tracking one's bank account
> withdrawals by taking notes such as "today I
> took some money out of my account," and
> "yesterday I withdrew a bit from my account."
> Such notations are just as meaningless for
> tracking total withdrawals of money from a
> bank account as "dredging for one month
> causing 5 NTUs over background turbidity" is
> for keeping track of the number of total
> salmon and steelhead injured or killed.

Dkt. #6, p. 26.

The plaintiffs also note that in some ITSs issued by NMFS, the

agency *did* provide actual numeric estimates of the number of ESUs

likely to be killed or injured by a proposed project, yet NMFS did

not even consider those numbers in the BiOp and ITS prior to

authorizing additional incidental take.   The plaintiffs assert this

failure "demonstrates NMFS'[s] complete lack of effort to track

total take of listed ESUs over time, no matter how it is quantified

or estimated."   *Id.*   The plaintiffs conclude that this failure

renders the 2010 BiOp arbitrary.   *Id.*, pp. 26-27.

### B.   *The defendants' arguments*

The defendants argue NMFS did, in fact, use the "best

available scientific data" in its assessment of the current status

of the affected salmonids and critical habitat.   Addressing the

plaintiffs' argument that NMFS uses the same language repeatedly in

the environmental baseline section of its BiOps relating to the

current status of the listed species and critical habitat, the

defendants point to the Consultation Handbook's "guidance on the

type of information used to prepare this section of a biological opinion." Dkt. #19, p. 11. The Consultation Handbook indicates the BiOp should include information on the life history, habitat, and distribution of the species, "'and other data on factors necessary to its survival . . . to provide background for analyses in later sections. This analysis documents the effects of all past human and natural activities or events that have led to the current status of the species.'" *Id.* (quoting Consultation Handbook at 4-19) The Consultation Handbook expressly provides, "'Once this section is developed for a given species, it can be used in successive biological opinions. Modification is necessary only when new information is developed.'" *Id.* (quoting Consultation Handbook at 4-20).

The defendants note that NMFS uses the four VSP criteria (abundance, productivity, spatial structure, and genetic diversity) as "a recognized 'framework for identifying the biological requirements of listed salmonids, assessing the effects of management and conservation actions, and ensuring that such actions provide for the survival and recovery of listed species.'" *Id.* (quoting 50 C.F.R. § 223.203(b)(4)(i)(B)). They assert that use of the VSP criteria for this purpose has been upheld by the courts repeatedly. Dkt. #19, p. 12 (citing *Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009); *Northwest Environ. Def. Ctr. v. NMFS*, 647 F. Supp. 2d 1221, 1238 (D. Or 2009) (Mosman, J.) ("*NEDC*"); & *Consolidated Salmonid Cases*, 713 F. Supp. 2d 1116, 1163-64 (E.D. Cal. 2010)).

The defendants note that the McElhany 2007 report, and a June 2005 Technical Memorandum, both used the VSP criteria to complete

41 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

"comprehensive assessments of the status of the salmon and steelhead at issue in this case." *Id.* McElhany 2007 assigned a 100-year extinction risk to each of the listed species, estimating the extinction risk for Lower Columbia River and Upper Willamette River Chinook, and Lower Columbia River coho salmon, as "high; and the extinction risk for Lower Columbia River and Upper Willamette River steelhead as "moderate." According to the defendants, McElhany 2007 makes it clear that the short life span of the salmonids requires data to be averaged over a period of time, and assessing the risk of extinction involves a level of professional judgment that takes into account information not readily quantifiable. In other words, the defendants argue quantification of the numbers of salmon affected by each separate incidental take statement would be unrealistic as well as inaccurate. *See id.*, pp. 13-14.

The defendants further assert that NMFS is not obligated to conduct new studies and come up with new information; rather, the 'best available data' requirement "'merely prohibits [NMFS] from disregarding available scientific evidence that is in some way better than the evidence [NMFS] relies on.'" *Id.*, p. 14 (quoting *Kern County Farm Bur. v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006) (internal quotation marks, additional citation omitted). They claim the plaintiffs' argument that the defendants failed to use the best available data "will be rejected where the plaintiff fails to 'cite[] any scientific studies that indicate the [agency]'s analysis is outdated or flawed.'" *Id.* (quoting *Ecology Ctr. v. Casteneda*, 574 F.3d 652, 659 (9th Cir. 2009)). The defendants argue the plaintiffs have not cited any scientific data

1  or studies that supposedly would be better than the analyses upon
2  which NMFS relied, and "Plaintiffs' attempt to overturn the
3  agency's expert opinion based on little more than unsupported
4  armchair science should be rejected." *Id.*

5       The defendants further observe that not all of the BiOps
6  issued between the McElhany 2007 report and the May 2010 BiOp
7  documented only adverse impacts.  They cite several instances where
8  BiOps actually found the agency actions under consultation would
9  benefit the affected species significantly. They also argue that
10 some of the authorized actions, whether their impacts were found to
11 be adverse or beneficial, resulted in no effect at all on any of
12 the factors limiting species recovery overall (i.e., "no effect on
13 the VSP"). Dkt. #19, p. 15 (citing *NEDC*, 647 F. Supp. 2d at 1238).

14      The defendants note that section 4 of the ESA requires NMFS
15 "to conduct a new status review of each listed species 'at least
16 once every five years,' . . . and, in fact, new status reviews for
17 the species at issue are underway."  Dkt. #19, p. 16 (quoting 16
18 U.S.C. § 1533(c)(2); citing 75 Fed. Reg. 13,082 (Mar. 18, 2010)).
19 They further note the Consultation Handbook only requires that a
20 BiOp include a summary of the status of the species as background
21 information, rather than requiring a discussion of "every impact
22 discussed in every prior biological opinion."  *Id.* (citing
23 Consultation Handbook at 4-19).

24      The defendants further claim the plaintiffs have misstated the
25 findings of the 2008 Jeopardy BiOp (referred to by the defendants
26 as the "Willamette Project BiOp").  The defendants state NMFS
27 evaluated that proposed project's impacts in the Upper Willamette
28 basin over a fifteen-year period, and once NMFS concluded the

1   proposed action "would be insufficient to avoid jeopardizing the
2   continued  existence"  of  Upper  Willamette  River  Chinook  and
3   steelhead, NMFS then developed reasonable and prudent alternatives
4   "calling for the implementation of significant changes to the dams
5   and  other  facilities,  including  major  construction  projects  to
6   provide fish passage, most of which are scheduled to be completed
7   between 2015 and 2024." Dkt. #19, p. 17 (citation omitted).   In
8   addition, the defendants state NMFS found the RPA would benefit the
9   affected species substantially.   The defendants further assert that
10  "contrary  to  Plaintiffs'  insinuations,  the  Corps  and  the  other
11  action  agencies  are  actively  implementing  the  RPA."  *Id.* (citing
12  Dkt. #20, Decl. of Mindy Simmons, ¶¶ 4-8; Dkt. #21, Decl. of Kevin
13  McArdle, Ex. 3).

14      The defendants also assert the 2008 RPA did not mandate that
15  NMFS collect monitoring information to demonstrate that the short-
16  term  measures  were  yielding  overall  improvement  in  the  status  of
17  the species.   They note, "NMFS found that it would take years for
18  the RPA to yield a measurable improvement in the overall status of
19  the affected species[.]"  Dkt. #19, p. 18.   Thus, the defendants
20  argue, "the *absence* of data as of May 2010 indicating whether RPA
21  implementation  had  yielded  a  change  in  the  overall  status  of  UWR
22  Chinook in no way indicates NMFS's assessment of the status of the
23  species  is  at  odds  with  the  best  data  *available*.   Plaintiffs'
24  'attempt  to  equate  an  absence  of  data  with  a  failure  to  analyze
25  does not succeed.'"  *Id.* (quoting *Oceana v. Norton*, 384 F. Supp. 2d
26  203, 231 (D.D.C. 2005); citing *Hammond v. Norton*, 370 F. Supp. 2d
27  226, 264 (D.D.C. 2005)).   Essentially, the defendants argue NMFS
28  cannot analyze nonexistent data.

44 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1   The defendants further contend that the plaintiffs are

2   proposing NMFS "institute a new system for conducting jeopardy

3   analyses that is akin to balancing a checkbook." Dkt. #19, p. 19.

4   The defendants argue this proposed methodology is unsupported by

5   any scientific data, and is foreclosed by NMFS's valid use of

6   surrogates to estimate incidental take. They rely on the court's

7   analysis in the *Consolidated Salmonid Cases*, 713 F. Supp. 2d 1116

8   (E.D. Cal. 2010), where the court held, "A decision about jeopardy

9   must be made based on the best science available at the time of the

10  decision; the agency cannot wait for or promise future studies."

11  *Id.*, 713 F. Supp. 2d at 1158. The plaintiffs in the *Consolidated*

12  *Salmonid Cases* argued NMFS "failed to apply the VSP methodology in

13  a sufficiently rigorous manner." *Id.*, 713 F. Supp. 2d at 1163.

14  The court found the plaintiffs' argument unpersuasive, holding as

15  follows:

16          The BiOp did not ignore the VSP methodology.
        Rather, it chose to use VSP in a qualitative
17      manner as a conceptual framework, as recom-
        mended by Lindley (2006). Although the analy-
18      sis in the BiOp may have benefited [sic] from
        the application of quantitative VSP methodolo-
19      gies, it is disputed whether the failure to do
        so represents a breach of accepted scientific
20      practice. A court must defer to the agency in
        such scientific disputes.
21          The agency is not required to generate
        new studies. For example, in *Southwest Center*
22      *for Biological Diversity v. Babbitt*, 215 F.3d
        58, 60-612 (D.C. Cir. 2000), the district
23      court found the available evidence regarding
        FWS's decision not to list the Queen Charlotte
24      goshawks "inconclusive" and held that the
        agency was obligated to find better data on
25      the species' abundance. The D.C. Circuit
        reversed, emphasizing that, although "the
26      district court's view has a superficial appeal
        . . . this superficial appeal cannot circum-
27      vent the statute's clear wording: The secre-
        tary must make his decision as to whether to
28      list a species as threatened or endangered

1
2
3
4

'solely on the basis of the best scientific and commercial data available to him. . . .' 16 U.S.C. § 1533(b)(1)(A)." *Id.* at 61. Requiring NMFS to adapt the VSP methodology to operate as a quantitative model would be the equivalent of requiring NMFS to generate data. The court has no authority to do so.

5 *Id.*, 713 F. Supp. 2d at 1163-64.

6       The defendants argue the plaintiffs have failed to cite any

7 scientific studies or methodology available to NMFS at the time it

8 issued the BiOp that demonstrated "NMFS could have 'tracked' the

9 various impacts discussed in prior biological opinions in a

10 biologically meaningful manner that would have allowed the agency

11 to conduct an alternative jeopardy analysis for the dredging

12 project at issue." Dkt. #19, p. 20. They further assert that the

13 "myriad impacts on salmonids often cannot be expressed in terms of

14 a specific number of affected fish that could be easily 'tracked.'"

15 *Id.* It is for this reason that NMFS uses surrogates to "perform

16 the function of a numeric estimate by providing a 'trigger' for

17 reinitiation of consultation, and NMFS 'articulate[s] a rational

18 connection between the surrogate and the taking of the species.'"

19 Dkt. #19, pp. 20-21 (quoting *Wild Fish Conservancy v. Salazar*, 628

20 F.3d 513, 531 (9th Cir. 2010)).

21       The defendants also argue that NMFS's choice of methodology

22 for assessing jeopardy "'is owed substantial deference'" under the

23 law. Dkt. #19, p. 22 (quoting *Gifford Pinchot Task Force v. FWS*,

24 378 F.3d 1059, 1066, 1067 (9th Cir. 2004))). In *Gifford*, the court

25 held that "[f]ocus on actual species count is an overly narrow

26 interpretation of what is required under the jeopardy prong." *Id.*,

27 378 F.3d at 1067. The defendants assert that regardless of the

28 plaintiffs' preference, "courts are not free to 'impose procedural

requirements that are [not] explicitly enumerated in the pertinent statutes." Dkt. #19, p. 22 (quoting *The Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (noting the court is "to conduct a 'particularly deferential review' of an 'agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable.'") (citations omitted).

The defendants disagree with the plaintiffs' contention that the ESA mandates their proposed approach, and they assert the *Oceana* case cited by the plaintiffs actually supports NMFS's position. Dkt. #19, pp. 22-23. Clarifying *Defenders of Wildlife*, the case upon which the plaintiffs rely, the *Oceana* court held that *Defenders of Wildlife* "'was not . . . imposing a requirement that each [BiOp] include a collective jeopardy finding, *i.e.*, a determination whether all federal agency action, considered together, is likely to jeopardize the continued existence of [the species].'" Dkt. #19, p. 23 (quoting *Oceana*, 384 F. Supp. 2d at 230) (internal quotation marks, citation omitted). The defendants instead rely on an unreported case from the Western District of Washington that was affirmed on appeal; i.e., *Northwest Environmental Advocates v. NMFS*, No. C04-0666RSM, 2005 WL 1427696, at *11 (W.D. Wash. June 15, 2005), *aff'd*, 460 F.3d 1125 (9th Cir. 2006). In that case, the court rejected the plaintiff's argument that NMFS had failed to identify or analyze the environmental baseline adequately because NMFS did not "articulate 'the degree to which the estuary's current degraded conditions, when measured against the species' status, leave any 'room' to accommodate additional adverse impacts without causing jeopardy.'" *Id.* The

47 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

court held the plaintiff's argument was "misguided because nothing in the statute, regulations, or guidance requires such an express articulation." *Id.*

The defendants also reject the plaintiffs' contention that NMFS ignored short-term adverse impacts of the proposed action on the listed species, or that "NMFS failed to consider whether the project's impact on the factors limiting species recovery 'is likely to prevent or appreciably delay recovery of these ESUs.'" Dkt. #19, p. 24 (quoting Pl's brief, Dkt. #6, at 23).    The defendants note the ESA only precludes federal actions that will "jeopardize the continued existence of" a threatened or endangered species, meaning the project "'reasonably would be expected, directly or indirectly, to *reduce appreciably* the likelihood of both the survival and recovery of a listed species in the wild.'" Dkt. #19, pp. 24-25 (quoting 50 C.F.R. § 402.02 (emphasis added). They note the preamble to the joint consultation regulations observes that "'[a]dverse effects may exist without constituting jeopardy,' . . . and 'adverse effects not rising to the level of jeopardizing the continued existence' of a listed species cannot be the basis for issuing a jeopardy opinion." Dkt. #19, p. 25 (quoting 51 Fed. Reg. at 19,950, 19,934-35; citing *Center for Marine Conserv. v. Brown*, 917 F. Supp. 1128, 1147 (S.D. Tex 1996); *Forest Guardians v. Veneman*, 392 F. Supp. 2d 1082, 1092 (D. Ariz. 2005) ("adverse effects were not inconsistent with 'no jeopardy' conclusion")).

The defendants argue the plaintiffs have not cited any of the project's potential effects that NMFS allegedly ignored, and they maintain NMFS conducted a thorough evaluation of all of the

48 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

project's potential effects, both short-term and long-term, in formulating the BiOp. *Id.* The defendants argue NMFS did everything it was required to do, including articulating a rational connection with the facts found and the choices made, and "[n]othing more is required under the deferential APA standard of review." Dkt. #19, p. 26 (citing *Northwest Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)).

Turning to the lawfulness of the ITS, the defendants argue NMFS's use of surrogates met all three of the requirements for the use of surrogates to estimate the amount or extent of incidental take. They assert that the use of surrogates is proper "if: (1) a numerical take estimate cannot practicably be obtained; (2) the surrogates perform the function of a numerical estimate by providing an adequate trigger for reinitiating consultation; and (3) NMFS 'articulate[s] a rational connection between the surrogate and the taking of the species.'" Dkt. #19, pp. 26-27 (quoting *Wild Fish Conservancy*, 628 F.3d at 531). They argue NMFS explained why it could not determine a numerical estimate of take; it "articu-lated a rational connection between the surrogates and the anticipated take"; and the surrogates used "provide clear triggers for reinitiating consultation." Dkt. #19, p. 27. They conclude that "[w]hile the surrogate triggers reflect the *anticipated impacts* of the project, this fact alone 'should not render them defective.'" Dkt. #19, p. 28 (quoting *NEDC*, 647 F. Supp. 2d at 1239).

The defendants further assert that the Corps' reliance on the BiOp was rational; indeed, the Corps "conducted its own assessment

49 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

and rationally concluded that the project would have no significant impact on listed species." Dkt. #19, p. 28.

For all these reasons, the defendants argue that the plaintiffs have failed to show they are likely to succeed on the merits in this case, or to raise "serious questions" going to the merits. *Id.*

## C.  *The Intervenor's arguments*

As expected, the intervenor's arguments are substantially similar to the defendants', and the court will not duplicate discussion of the same arguments raised by the defendants. The intervenor does, however, raise some additional points.

First, the intervenor notes that the plaintiffs' argument in favor of a "running tally" of incidental take already has been flatly rejected by this court in *NEDC*. The plaintiffs in *NEDC* also used the "bank account" analogy, and argued NMFS had failed to take action to determine the "'current balance' of the take bank account, or whether a new project would 'overdraw the account.'" Dkt. #14, pp. 16-17 (quoting *NEDC*, 647 F. Supp. 2d at 1237). The *NEDC* court held:

> "[T]he ESA does not prescribe how the jeopardy prong is to be determined." *Gifford Pinchot*, 378 F.3d at 1067. NMFS acted reasonably in this case. Current levels of take cannot be categorized numerically and the VSP are an appropriate scientifically based proxy. Based on the abundant information in the BiOp about the current state of each of the listed species and the state of the critical habitat, NMFS knows "roughly at what point survival and recovery will be placed at risk." *Nat'l Wildlife Fed'n*, 524 F.3d at 936. Thus, NMFS's determination of no jeopardy was not arbitrary and capricious due to a failure to account for the current level of take in the Willamette.

50 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

*NEDC*, 647 F. Supp. 2d at 1238.  The intervenor argues the plaintiffs' position in the present case fails for the same reasons articulated by the *NEDC* court.  Dkt. #14, p. 17.

The intervenor further argues the plaintiff's "running tally argument . . . fundamentally makes no sense" because it "is premised on two misconceptions: (1) one 'take' equals one dead or seriously injured fish; and (2) only a finite amount of take is available."  Dkt. #14, p. 19.  The intervenor asserts neither of these conceptions is accurate, pointing to the definition of "take" in the regulation, 16 U.S.C. § 1532 (19).  *Id.* (noting that "Take" under the ESA does not equal "mortality."); *see* p. 9, *supra*. Thus, the intervenor asserts, "Take could be as severe as death, as minor as a momentary harassment, or as ephemeral as an 'attempt to engage in any such conduct.'"  Dkt. #14, p. 19 (quoting 16 U.S.C. § 1532(19)).

The intervenor argues the plaintiffs' reliance on *Defenders of Wildlife* is inapposite.  According to the intervenor, the same court later clarified that it had never held a BiOp must add all prior takes, and "a biological opinion could be legally valid 'even though it does not numerically add the takes from different sources together.'"  Dkt. #14, p. 20 (quoting *Oceana*, 384 F. Supp. 2d at 230).[10]  The intervenor argues the plaintiffs are attempting to require NMFS to use an "actual species count," a requirement that has been rejected by the Ninth Circuit.  Dkt. #14, pp. 20-21 (citing *Gifford Pinchot*, 378 F.3d at 1067).  The intervenor claims

---

[10]I discuss the *Oceana* case in more detail in section VII.E., *infra*.

the plaintiffs' methodology argument fails in light of NMFS's use of VSP methodology to evaluate jeopardy.  Dkt. #14, p. 23.

Regarding the ITS, the intervenor argues NMFS's use of surrogates to establish triggers to the reinitiation of consultation was both proper and sanctioned by the courts.  The intervenor notes a surrogate "must contain 'measurable guidelines' and 'must not be so general that the applicant or the action agency cannot gauge its level of compliance.'"  Dkt. #14, p. 26 (quoting *ONRC*, 476 F.3d at 1038)).  The intervenor argues the ITS in this case meets those requirements by NMFS's selection of two surrogate triggers, either of which, if exceeded, will require reinitiation of consultation.  "The first trigger is the one-month duration of the project; if the project lasts longer than one month, then the suspended sediments will increase beyond those anticipated, and reinitiation is necessary.  [BiOp at 22.]  The second trigger is a turbidity level of 5 NTU over background as measured 500 feet from the dredging area; if that level is exceeded, then the project is having a greater impact than anticipated, and a reinitiation is therefore necessary."  Dkt. #14, pp. 26-27.

The intervenor rejects the plaintiffs' argument that these surrogates are "coextensive with the project's own scope," as was the case in *ONRC*.  *See ONRC*, 476 F.3d at 1039; Dkt. #14, p. 27. Instead, the intervenor notes the scope of the proposed dredging project is removal of "45,000 cubic yards from the Willamette River to restore the channel's 40-foot navigation depth at RM 2.1-2.4, which is 30,000 cubic yards less than the scope and impact analyzed

/ / /

/ / /

in the Post office Bar BiOp."[11]  Dkt. #14, p. 27 (citation omitted).
According to the intervenor, the two surrogate factors "are not the
'scope' of the project[,] but rather are mitigation and monitoring
measures designed to limit the amount of take," *id.*, and if they
are exceeded, then the ITS requires reinitiation of consultation.
*Id.*, pp. 26-27.  That is to say, for example, that the scope of the
project was not to generate turbidity of 5 NTU over background.
The intervenor further notes that the *NEDC* court distinguished *ONRC*
and rejected almost identical arguments offered by the plaintiffs
in that case.  *Id.*, p. 28.

### D.   *The plaintiffs' reply*

The plaintiffs first assert they are not attempting to change
the way NMFS implements the ESA, as argued by the defendants and
the intervenor, nor are they seeking to impose "a new and novel
methodology" upon the agency.  Dkt. #23, p. 1.  The plaintiffs
state they do not "take issue with NMFS'[s] scientific judgment;
rather, Plaintiffs maintain that NMFS did not follow the law and
the agency's own policies in preparing the Post Office Bar BiOp."
*Id.*, p. 2.  The plaintiffs state their analogy of a bank account
that becomes overdrawn, or the final straw that breaks a camel's

---

[11]The project's scope initially was to remove 75,000 cubic
yards of sediment from the river.  One of the surrogates utilized
by NMFS to define the amount or extent of incidental take is
limiting the time frame of the project to thirty days; if the
project exceeds thirty days, that will trigger reinitiation of
consultation.   At  oral  argument,  the  intervenor  stated  its
understanding that the Corps has decided to limit dredging to
thirty days, during which only about 45,000 cubic feet will be able
to be removed.

53 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1   back, simply illustrated the type of analysis required by ESA
2   section 7 and its accompanying regulations and policies.

3       The plaintiffs acknowledge that incremental adverse impacts on
4   listed species or designated critical habitat are allowed under
5   section 7, but they argue such impacts are allowed only until "the
6   total impacts reach a point where a proposal for yet more impacts
7   must be halted because 'the action effects, when added to the
8   underlying baseline conditions, would tip the species into jeopardy
9   [or adverse modification of critical habitat]." Dkt. #23, p. 3
10  (quoting *National Wildlife Fed. v. NMFS*, 524 F.3d 917, 929 (9th
11  Cir. 2008)). Thus, the plaintiffs argue, NMFS rationally cannot
12  "assess whether or not a project with adverse effects to species
13  and/or critical habitat can proceed" without first "knowing how
14  close a species or its critical habitat is to the jeopardy/adverse
15  modification lines[.]" Dkt. #23, p. 4.

16      The plaintiffs point to NMFS's representation, in 2000, when
17  the agency "adopted rules governing take of four of the five ESUs
18  affected by the Post Office Bar project," that it "'intend[ed] to
19  work with co-managers to develop the necessary standards and
20  assessment techniques'" and it was "'moving toward implementing a
21  method for assessing total take across broad sectors.'" Dkt. #23,
22  p. 6 (quoting 65 Fed. Reg. 42422-01, 42440 (2000). The plaintiffs
23  argue that NMFS and its co-managers have failed to develop these
24  "standards and assessment techniques" despite the passage of more
25  than a decade since NMFS made this representation.

26      The plaintiffs also argue the VSP criteria, standing alone,
27  are inadequate to comply with the analyses required by section 7.
28  The plaintiffs argue "[t]he concept of a 'viable population'

1   focuses on the likelihood that a salmonid population will persist
2   over 100 years, and does not attempt to set forth criteria to
3   assess habitat condition or impacts." Dkt. #23, p. 7 (citation
4   omitted). The plaintiffs assert that although the VSP criteria are
5   useful as "a generic framework . . . in assessing risk to salmon
6   populations," even NMFS has noted that application of the VSP
7   criteria "'will require population- and ESU-specific evaluations.
8   This will not be very satisfying to managers looking to VSP for
9   "the answer," but is the only scientifically sound course at this
10  time.'" Dkt. #23, p. 8 (quoting 65 Fed. Reg. at 42430).

11      The plaintiffs further argue the McElhany 2007 report upon
12  which the defendants rely supports the plaintiffs' position that
13  "'[a] current status evaluation . . . is concerned with providing
14  an accurate view of where a population is at a given time and
15  should utilize *all* available information.'" Dkt. #23, p. 9
16  (quoting McElhany 2007 at 4) (emphasis in original). The
17  plaintiffs maintain the Consultation Handbook similarly requires
18  that a jeopardy analysis include an assessment of 'the aggregate
19  effects of everything that has led to the species' current status
20  and, for non-Federal activities, those things likely to affect the
21  species in the future.'" *Id.* (quoting Consultation Handbook at
22  4-35).

23      The plaintiffs take issue with the defendants' representation
24  that NMFS only needs to update information on the ESUs' current
25  status when "'new information is developed indicating that the
26  status of the species has changed.'" Dkt. #23, p. 10 (quoting Dkt.
27  Dkt. #19, p. 16). The plaintiffs assert that obviously, NMFS
28  cannot "develop information indicating that species' status has
55 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1  changed if it has no intent or means of tracking incremental

2  impacts to these species over time." *Id.*

3       The plaintiffs also claim the McElhany 2007 report was updated

4  in 2009, to determine that the risk of extinction of upper

5  Willamette River Chinook has degraded from "high" to "very high,"

6  and that of the UWR steelhead actually had improved from "moderate"

7  to "low." The plaintiffs observe that NMFS was a part of the

8  "recovery team" that issued a draft recovery plan for Willamette

9  River ESUs in October 2010, which cited the 2009 update, but

10 nevertheless, NMFS used the 2007 extinction risks in the 2010 BiOp

11 instead of the updated risks, and continues to insert boilerplate

12 language regarding the species' "current status." Dkt. #23,

13 p. 12.[12]

14      Further, the plaintiffs argue the "VSP criteria were designed

15 solely to determine viability of salmonid populations, not to

16 evaluate salmon habitat." *Id.* They argue NMFS "virtually

17 ignor[ed] critical habitat" in their evaluation of the proposed

18 dredging project. *Id.*, pp. 12-13. As with the jeopardy analysis

19 of the species, the plaintiffs argue NMFS erred in failing to

20 consider its previous BiOps detailing those projects' impacts on

21 critical habitat. *Id.*, p. 13. The plaintiffs further reiterate

22 their argument that NMFS failed to use the best science available

23 by failing to consider all the available evidence relating to

24

25

26    _____

27       [12]At oral argument, the Defendants stated there was no 2009
      "update" to McElhany 2007. Rather, there was a proposed revision
      that appeared in the draft recovery plan. No such revision to the
28    McElhany report has been adopted.

1    implementation and effectiveness of the RPA set forth in the 2008

2    Jeopardy BiOp. *Id.*, pp. 13-16.

3        Regarding the defendants' argument that NMFS did, in fact,

4    consider the short-term impacts to the listed ESUs and their

5    critical habitat, the plaintiffs observe that although the

6    defendants and the intervenor "argue strenuously that NMFS

7    evaluated the short term impacts to listed species and critical

8    habitat and found them acceptable, they never point to actual

9    language in the BiOp supporting this finding."  *Id.*, p. 16

10   (citations omitted).

11

12   ***E.   Discussion***

13       The court first notes that the plaintiffs rely on *Defenders of*

14   *Wildlife* for the proposition that a BiOp must include an analysis

15   of previous agency actions on the endangered species.    The

16   defendants and intervenor argue *Oceana* effectively negated

17   *Defenders of Wildlife* by "clarifying" that a BiOp can be legally

18   valid "even though it does not numerically add the takes from

19   different sources together." *Oceana*, 384 F. Supp. 2d at 230.    It

20   is instructive to examine what the *Oceana* court held in more detail

21   to place the parties' arguments in proper context.

22              In *Defenders [of Wildlife]*, the Court held
                that "[t]he impact of an authorized incidental
23          take cannot be determined or analyzed in a
            vacuum, but must necessarily be addressed in
24          the context of other incidental take author-
            ized by FWS. . . .  The [BiOp] must also
25          include an analysis of the effects of the
            action on the species when 'added to' the
26          environmental baseline - in other words, an
            analysis of the *total* impact on the species."
27          130 F. Supp. 2d at 127-28 (quoting 50 C.F.R.
            § 402.02) (emphasis in original).  Because FWS
28          had merely listed the other activities

57 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

affecting the pronghorns without making them
part of its analysis, the Court found the
[BiOp] to be inadequate.  When the agencies
issued new [BiOps] on remand, the plaintiffs
moved to enforce the Court's order, claiming
that the [BiOps] were still inadequate.
*Defenders of Wildlife v. Norton*, 2003 WL
24122459 (D.D.C. Jan. 7, 2003) (hereinafter
"*Defenders II*").  In this second round, the
Court clarified that a [BiOp] is adequate if
it "takes the baseline seriously and makes a
concerted effort to evaluate the impact of
[the agency's] proposed action against that
backdrop."  *Id.* at *4.  *Defenders [of Wild-
life]* . . . was not . . . imposing a require-
ment that each [BiOp] include a collective
jeopardy finding, i.e., a determination
whether *all* federal agency action, considered
together, is likely to jeopardize the con-
tinued existence of [the species]."  *Id.* at *5
(emphasis in original).  The Court concluded
that the [BiOp] issued on behalf of the BLM
was sufficient because it set out the take
anticipated for nine other agency actions,
considered the potential effects of the
proposed BLM action, and specifically acknowl-
edged that the BLM's actions needed to be
evaluated in the context of an environmental
baseline showing that Sonoran pronghorns were
in "immediate danger of extirpation."  *Id.*
at *4.

*Oceana*, 384 F. Supp. 2d at 230.  Thus, although the *Oceana* court

held a BiOp need not "numerically add the takes from different

sources together," *id.*, it held an agency is required to evaluate

a proposed action "in light of the environmental baseline," which,

by definition, must include consideration of the effects of other

agency actions and the current status of the ESUs at issue.  *See*

*id*; 50 C.F.R. § 402.14(g)(3) (the agency must "[e]valuate the

effects of the action and cumulative effects on the listed species

or critical habitat").

   The defendants are correct that "[f]ocus on actual species

count is an overly narrow interpretation of what is required under

the jeopardy prong."  *Gifford Pinchot*, 378 F.3d at 1067.  Rather,

1   a jeopardy analysis may be based on "a habitat proxy," *id.*, (*i.e.*,

2   "predicting species jeopardy based on habitat degradation," *id.*,

3   378 F.3d at 1066); and ecological conditions may be used "as a

4   surrogate for defining the amount or extent of incidental take

5   . . . so long as these conditions are linked to the take of the

6   protected species." *Arizona Cattle Growers Ass'n*, 273 F.3d at 1250

7   (internal quotation marks omitted). Here, NMFS analyzed the status

8   of the listed salmonids using the VSP criteria (i.e., abundance,

9   productivity, spatial structure, and genetic diversity).  This

10  court has held previously that "the VSP are an appropriate

11  scientifically based proxy." *NEDC*, 647 F. Supp. 2d at 1238 (quoted

12  in context *supra*, p. 50).

13      The court rejects the plaintiffs' argument that the surrogates

14  NMFS employed in this case are "coextensive with the project's own

15  scope" because NMFS did not link the surrogates to actual numbers

16  of incidental take.  *See* Dkt. #26, pp. 25-26.  Use of a surrogate

17  only comes into play when the agency is *unable* to determine the

18  actual numbers of take.  Arguing a surrogate cannot be used unless

19  it is linked to actual numbers of incidental take, when the only

20  time surrogates are used is when actual numbers are unavailable, is

21  circular reasoning.

22      The key to the plaintiffs' case is the statutory language

23  itself.  The applicable statute requires that after consultation,

24          the Secretary shall provide to the Federal
            agency and the applicant, if any, a written
25          statement setting forth **[1]** the Secretary's
            opinion, and **[2]** a summary of the information
26          on which the opinion is based, detailing how
            the agency action affects the species or its
27          critical habitat.  If jeopardy or adverse
            modification is found, the Secretary shall
28          suggest those reasonable and prudent alterna-

1  
2  
3  

> tives which he believes would not violate
> subsection (a)(2) of this section and can be
> taken by the Federal agency or applicant in
> implementing the agency action.

16 U.S.C. § 1536(b)(3).  Thus, the Secretary is charged with

setting forth an opinion, and a summary of the information upon

which the opinion is based.  The law does not specify the

particular methodology NMFS must use.  Moreover, the plaintiffs

have failed to cite a single scientific study NMFS failed to

consider, or to provide a single expert opinion of their own

concluding the proposed dredging action would jeopardize the ESUs

or their critical habitat, either within the defined action area or

on a broader scale.

    The court recognizes that a different methodology is needed in

order to allow NMFS and other federal agencies to provide more

accurate opinions regarding the current status of threatened and

endangered species and critical habitat.  However, the court is not

free to rewrite the statute to include additional requirements such

as the development of new methodologies or new data.  Further, the

"agency's scientific methodology is owed substantial deference[.]"

*Gifford Pinchot*, 378 F.3d at 1066 (citing *United States v. Alpine

Land & Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989)).

    The court finds the plaintiffs have failed to meet their

burden to show either a likelihood of success on the merits, or the

existence of substantial questions going to the merits.


### VIII.   IRREPARABLE HARM

    In order to obtain a preliminary injunction, the plaintiffs

also "must establish that irreparable harm is likely, not just

60 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

possible." *Frankl v. HTH Corp.*, ___ F.3d ___, 2011 WL 2725812 (9th Cir. July 13, 2011) (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).   There is "considerable overlap" between the "irreparable harm" prong of the preliminary injunction standard and the "likelihood of success on the merits" or "serious question" prong. *Earth Island Institute v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010).

Thus, in Ninth Circuit ESA cases, the general "'test for determining if equitable relief is appropriate is whether an injunction is necessary to effectuate the congressional purpose behind the statute.'" *Pacific Coast Fed. of Fisherman's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1203 (E.D. Cal. 2008) (quoting *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 (9th Cir. 2002)).   The *Pacific Coast* court observed that "[t]here is considerable disagreement and confusion about what should be considered 'irreparable harm' for purposes of . . . injunctive relief proceedings.   The Ninth Circuit has not articulated a standard or threshold at or above which ESA 'harm' is considered 'irreparable.'" *Pacific Coast*, 606 F. Supp. 2d at 1207 (footnote omitted).   However, "[a] court need not wait until the species is immediately threatened with extirpation to issue injunc- tive relief." *Id.* (citing *American Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 258-69 (D.D.C. 2003) "(injunction may issue if the number of individuals likely to be taken as a result of agency action during the time it will take to conclude the litigation will cause 'significant' harm to the species, even if there is 'not the remotest possibility that the planned agency activity . . . would eradicate the species')"; *Swan View Coal, Inc.*

61 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

*v. Turner*, 824 F. Supp. 923, 938 (D. Mont. 1992) "(threatened extinction not necessary for a finding of harm under the ESA)").[13]

The plaintiffs argue they have shown a likelihood of irreparable harm, pointing to the BiOp's finding that the dredging project will have adverse effects on five of the listed species and their critical habitat, "as well as kill or injure an indefinite number of juvenile members of these species." Dkt. #6, p. 27 (citing BiOp at 14, 20). They argue this finding alone is sufficient under *Tennessee Valley Authority* to tip the balance in favor of issuing a preliminary injunction. They further assert that a strong public interest exists "'in preserving nature and avoiding irreparable environmental injury.'" Dkt. #6, p. 29 (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1130 (9th Cir. 2011)) (citation omitted). They argue that any delay in the dredging project and its "potential limits to navigation due to the delay cannot outweigh ensuring the continued existence of listed salmon and steelhead ESUs." Dkt. #6, p. 31.

The defendants argue the plaintiffs "cannot spend 26 pages attacking the BiOp as arbitrary and illegal - and then turn around and rely on the same BiOp to try to meet their burden of demonstrating irreparable harm." Dkt. #19, p. 29. The defendants cite *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 545, 107 S. Ct. 1396, 1404, 94 L. Ed. 2d 542 (1987), for the

---

[13]Should the court ultimately conclude the defendants have violated the ESA, the burden would be on the defendants to prove the proposed action is non-jeopardizing. *Washington Toxics Coalition v. E.P.A.*, 413 F.3d 1024, 1035 (9th Cir. 2005). However, the court does not so find at this stage of the proceedings. Accordingly, the burden remains on the plaintiffs to show a likelihood of irreparable harm.

proposition that "[h]arm is irreparable if it is 'permanent or of long duration.'" *Id.* (quoting *Village of Gambell*).  However, the Court in *Village of Gambell* did not define the term "harm" in those terms.  In *dicta*, the Court noted:

> [The district court held] that "[i]rreparable damage is *presumed* when an agency fails to evaluate thoroughly the environmental impact of a proposed action."  [Citation omitted.] This presumption is contrary to traditional equitable principles and has no basis in [the Alaska National Interest Lands Conservation Act].  Moreover, the environment can be fully protected without this presumption.  Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Village of Gambell*, 480 U.S. at 544-45, 107 S. Ct. at 1404.

The defendants further argue the plaintiffs' contention that "*any* adverse impact on a listed species - no matter how minor or temporary - constitutes irreparable harm . . . fails as a matter of law." Dkt. #19, p. 29 (citing Dkt. #6, p. 28).  The defendants argue the plaintiffs must show the proposed action would "jeopardize the continued existence of the species *as a whole*." Dkt. #19, p. 30 (emphasis in original).  The defendants note the plaintiffs, themselves, acknowledge that the ESA "'does not prohibit all negative impacts on listed salmon and steelhead or their critical habitat; rather, it only prohibits agency actions that have the effect of jeopardizing an *entire* listed ESU or adversely modifying the conservation value of an *entire* critical habitat designation.'" *Id.* (quoting Dkt. #6, p. 3; citing *id.*, p. 18).

63 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

The defendants argue the plaintiffs' assertion that the project's "minor adverse effects . . . 'could prove disastrous' . . . is precisely the kind of speculative allegation of *possible* harm that cannot, after *Winter*, support the issuance of an injunction." *Id.* They argue the plaintiffs have failed to show that irreparable harm is not only possible, it is *likely*, and therefore the plaintiffs' request for injunctive relief should be denied. *Id.*

The intervenor notes the plaintiffs have "concede[d] that standing alone the 'adverse impacts to the designated critical habitat' caused by the project are 'relatively modest.'" Dkt. #14, p. 29 (quoting Dkt. #6, p. 1). The intervenor argues the plaintiffs have ignored the ultimate finding in the BiOp that the proposed project "will not affect the abundance, productivity, and distribution of genetic diversity of any of the affected populations of the species. Therefore, it will not appreciably reduce the likelihood of survival and recovery of any of the listed species.'" *Id.* (quoting BiOp at 20). The intervenor further faults the plaintiffs for failing to offer an expert opinion or other evidence to challenge NMFS's conclusions set forth in the BiOp, instead proffering "only unsubstantiated and conclusory allegations of harm." *Id.*

In reply, the plaintiffs first attack the defendants' reliance on the District of Montana case, *Defenders of Wildlife v. Salazar*, "for the proposition that harm to the species justifying an injunction must be 'significant' to the overall population." Dkt. #23, p. 18 (quoting Dkt. #19, p. 29). The plaintiffs assert, "This is a higher standard than imposed by many other courts." *Id.*

64 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

1   They cite three federal district court cases from the District of
2   Columbia, one case from the District of Columbia Circuit, and one
3   Ninth Circuit case in support of this proposition. *See id.* (citing
4   *inter* alia, Marbled *Murrelet v. Babbitt*, 83 F.3d 1060, 1067-68 (9th
5   Cir. 1996) "(finding sufficient showing of harm to warrant
6   permanent injunction against logging 237-acre forest tract that
7   yielded 100 detections of murrelets from a listed three-state
8   population estimated at 18,000 birds)." *Id.*

9        The plaintiffs return to their original argument that the BiOp
10  itself is the best evidence of irreparable harm, where it indicates
11  lower Columbia Chinook are at a "high risk" of extinction, and
12  their population is in the "extirpated or nearly so" abundance
13  category.  *Id.* (citing BiOp at 6).  They further note the BiOp's
14  citation of the McElhany 2007 finding that "'[f]urther habitat
15  changes in the Willamette River . . . would likely have a
16  significant effect on fall Chinook salmon.'" *Id.* (quoting BiOp
17  at 6).  They also again note the purportedly increased risk of
18  extinction of the upper Willamette Chinook salmon from "high" in
19  2007, to "very high" in 2009.  Dkt. #23, p. 19.  The plaintiffs
20  close by observing that because NMFS has no way of determining the
21  current, cumulative status of the ESUs based on the incremental
22  impact of repeated incidental take authorizations, the actual
23  status of the listed ESUs may be even more dire than reflected in
24  the BiOp. *Id.*

25       In *Winter*, the Supreme Court made it clear that a plaintiff
26  seeking injunctive relief must show more than "a possibility of
27  irreparable harm."   The Court held, "Issuing a preliminary
28  injunction based only on a possibility of irreparable harm is

1   inconsistent with our characterization of injunctive relief as an
2   extraordinary remedy that may only be awarded upon a clear showing
3   that the plaintiff is entitled to such relief." *Winter*, 129 S. Ct.
4   at 375-76 (citing *Mazurek v. Armstrong*, 530 U.S. 978, 972, 117
5   S. Ct. 1865, 138 L. Ed. 2d 162 (1997) (*per curiam*)); *see Earth*
6   *Island Inst.*, 351 F.3d at 1211 ("[T]he moving party must
7   demonstrate a significant threat of irreparable injury, irrespec-
8   tive of the magnitude of the injury.") (citations omitted).

9        Here, the plaintiffs have offered no more than speculation
10  that irreparable harm will occur if an injunction is not issued.
11  They have offered no scientific studies or expert opinions in
12  support of their position.  They argue NMFS should quantify its own
13  ITSs issued over the past several years, without pointing to
14  particular information in those ITSs that shows NMFS authorized
15  cumulative incidental takes that actually placed the affected
16  species in jeopardy.  Merely saying the prior BiOps and ITSs are
17  the "best science" regarding the status of the ESUs and critical
18  habitat is not enough.  The plaintiffs have failed to point to the
19  information contained within those documents that they contend
20  proves the listed ESUs are in jeopardy.

21       The court finds the plaintiffs have failed to prove that
22  irreparable harm is likely to result if an injunction is not
23  issued.

24

25                            ***CONCLUSION***

26       Because the plaintiffs have failed to show either a likelihood
27  of success on the merits or substantial questions going to the
28

66 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION

merits, and a likelihood of irreparable harm, their motion for a
preliminary injunction is **denied.**

IT IS SO ORDERED.

Dated this _29th____ day of July,
2011.


/s/ Dennis J. Hubel

_____
Dennis James Hubel
United States Magistrate Judge

67 - ORDER ON MOTION FOR PRELIMINARY INJUNCTION